UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| RONALD HARDING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-158-B-W |
| | ) | |
| CIANBRO CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**AMENDED[1]ORDER ON DEFENDANT CIANBRO CORPORATION'S
MOTION FOR SUMMARY JUDGMENT**

Afflicted with fibromyalgia,[2] osteoarthritis,[3] and chronic back pain, Plaintiff

Ronald Harding challenges Defendant Cianbro Corporation's (Cianbro) termination of

his employment as an electrical superintendent. Concluding Mr. Harding has raised

genuine issues of material fact on the contested counts, this Court denies Cianbro's

Motion for Summary Judgment.

**I. FACTUAL BACKGROUND**

**A. The Parties**

Defendant Cianbro is a Maine-based contractor, which currently employs between

1,900 and 2,000 individuals. *Pl.'s Stat. of Mat. Facts* (PSMF) ¶ 1 (Docket # 48); *Def.'s*

---

[1] This Amended Order merely corrects a typographical error on Page 17 of the Order on Motion for Summary Judgment. Under F., the date should read September 9, 2002, not September 9, 2005.
[2] The parties have not provided an agreed upon definition of these medical conditions. For background, however, fibromyalgia is a chronic pain illness characterized by musculoskeletal aches, pain and stiffness, soft tissue tenderness, fatigue, and sleep disturbances. http://www.fmaware.org/fminfo/brochure.htm. Although the most common sites of pain include the shoulders, back, pelvic girdle, neck, and hands, any part of the body can be involved. *Id.* Persons afflicted with fibromyalgia experience a range of symptoms of varying intensities that wax and wane over time. *Id.*
[3] Osteoarthritis is a disease of the joints. http://www.medicinenet.com/osteoarthritis/page3.htm. Its most common symptom is pain in the affected joint(s) after repetitive use. *Id.* Symptoms of osteoarthritis vary greatly from person to person. *Id.* While some individuals can be debilitated by their symptoms, others may have very few symptoms despite dramatic degeneration. *Id.* Symptoms can be intermittent; it is not unusual for persons with osteoarthritis of the hands to have years of pain-free intervals. *Id.*

*Resp. to Pl.'s Stat. of Mat. Facts* (DRPSMF) Part II ¶ 1 (Docket # 77).   Thirty-two are project managers and 64 are superintendents.   DRPSMF – Part II ¶ 1.   Prior to his termination in September of 2002, Plaintiff Ronald Harding spent approximately 18 ½ years employed by Cianbro.   PSMF ¶ 2.   He began his career as an electrical foreman and, in 1988, he was promoted to electrical superintendent.[4]   *Id.*; DRPSMF – Part II ¶ 2. Although Mr. Harding worked on many Cianbro projects in New England and upstate New York, he was never in charge of a work site.   PSMF ¶ 2; DRPSMF – Part II ¶ 2.

### B.  Mr. Harding's Claims

On September 9, 2004, based on a claim of wrongful termination of employment, Mr. Harding filed suit alleging under Count I, a violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, under Count III, a violation of the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, and under Count V, a violation of the Maine Human Rights Act (MHRA), 5 M.R.S.A. § 4551 *et seq.*[5, 6]

### C.  Mr. Harding's Physical Ailments

Mr. Harding had a number of physical ailments during his career at Cianbro.   The first ailment, chronic back pain, was caused by a car accident that took place when Mr. Harding was just eighteen years old.   PSMF ¶ 11; DRPSMF – Part II ¶ 11.   To relieve his

---

[4] At his termination, Mr. Harding held the position of electrical superintendent and earned approximately $90,000 per year plus benefits.  PSMF ¶ 4.

[5] On October 12, 2005, Mr. Harding filed a motion to stay decision of his claims under the MHRA pending resolution of questions certified to the Maine Supreme Judicial Court sitting as the Law Court in *Whitney v. Wal-Mart*, Civil No. 04-38-P-H.  (Docket # 44).  This Court granted Mr. Harding's motion on November 10, 2005.  (Docket # 78).  Consequently, this opinion does not address Count V of the First Amended Complaint.  Count VI, however, which alleges a retaliation claim in violation of the MHRA, is addressed in footnote 5, *infra*.

[6] Mr. Harding's First Amended Complaint also asserts unlawful retaliation.  Counts II, IV, and VI claim that Cianbro retaliated in violation of the ADA, Rehabilitation Act, and the MHRA, respectively, "when it refused to rehire [Mr. Harding] following the dissolution of S&L Construction" due to his prior filing of a complaint with the Maine Human Rights Commission (MHRC).  *First Amend. Compl.* ¶¶ 27, 33, 39 (Docket # 4).  Mr. Harding has conceded to summary judgment in favor of Cianbro on Counts II, IV, and VI.  *Supp. Decl. of Jeffrey Neil Young* ¶ 2 (Docket # 66).

symptoms, Mr. Harding treated regularly with a chiropractor, Dr. Thomas Chasse.  PSMF ¶ 11; DRPSMF – Part II ¶ 11.  Nick Bell, Cianbro's Electrical Manager for the northern New England region, was aware of Mr. Harding's back problems over the years and his frequent treatment with Dr. Chasse.  PSMF ¶ 12; DRPSMF – Part II ¶ 12.

On October 27, 1995, Mr. Harding went to Dr. Ringel, a sleep specialist, because he was experiencing problems with "restless sleep" and remaining awake during the day.[7] PSMF ¶ 13; DRPSMF – Part II ¶ 13.  Dr. Ringel described Mr. Harding on this first visit:

10-27-95  Ronald Harding

48 year old male appears in my office for the first time.

1. Smoking.  The patient smokes a pack of cigarettes a day.  He is a sedentary, obese male who looks at high risk.  He has never tried patches before.  He has been discouraged by the failure of others.  I will begin him on Panitrol 21 mgs. patch daily along with 7 mgs. in addition if he needs.  The patient states he gained about 20 lbs the first week and a half he started to stop smoking in the past.  He states he gets real nervous at times.  Will add Atovan .5 mgs. 1-2 tablets every 4-6 hours as needed for nerves . . . .

2. Fatigue.  This obese male states he fell asleep while waiting for me in the office.  He describes restless sleeping for the last several years.  His wife states he does snore at times.  He often falls asleep whenever he sits in any quiet position.

A: I suspect that this man many [sic] have obstructive sleep apnea as he almost dozed off while he was talking to me in the office.  We will arrange for a sleep apnea study.  Also get a blood count, thyroid study, blood sugar, urinalysis, sedrate.  I have asked that he be scheduled for a physical and medical release requested from Dr. McDermott.  I have told him through Nancy that he is not to drive as this man has been falling asleep in the waiting room.

PSMF, att. 1 at Bates No. 173.

---

[7] Dr. Bennett, Mr. Harding's primary care physician, referred him to Dr. Ringel.  PSMF ¶ 13.

Eventually, Dr. Ringel ruled out sleep apnea and considered other diagnoses.  In a December 11, 1995 office note, he described Mr. Harding's symptoms and possible alternative diagnoses:

> Ronald Harding is a 48-year-old man who was referred from Dr. Bennett because of a possible sleep disturbance.  The primary consideration is narcolepsy.
>
> The patient's chief complaint is muscle aching.  He says that he sleeps, 7-9 hours every night and will get up feeling tired.  He says that his muscles have ached on and off for about a year.  . . .  He has basically migrating aches and pains in arms, legs and back.  He has had no loss of strength. . . .  He denies any w[eight] gain or loss.  He denies any change in appetite.  He denies any other constitutional symptoms.  He says that he will feel during the day as if it is very difficult for him to finish his work and that he will fall asleep if he sits still for 10 or 15 minutes.  I questioned him rather carefully and cannot really identify any sleep attacks or other . . . complaints.
>
> The patient will usually go to bed between 8:00 and 9:00 p.m. and on a weekday will wake up at 4:45 a.m.  On a weekend, he will get up about 7:00 a.m.  He does not have significant headaches.
>
> . . .
>
> He apparently does wake up at night but will fall asleep fairly successfully after getting up to the bathroom.  He wakes up achy all the time.  He denies any joint pains per se but says this is all in the muscle.
>
> . . .
>
> Differential diagnosis would include fibromyalgia, arthritis, or perhaps even a collagen vascular disease.

*Id.* at Bates Nos. 256-57.  Dr. Bennett, Mr. Harding's primary care physician, diagnosed Mr. Harding with fibromyalgia.  PSMF ¶ 15.

On March 25, 2005, nearly three years after Cianbro's termination of his employment, Mr. Harding saw Dr. Lisa Fitzgerald, a Boston rheumatologist affiliated with Harvard Medical School.  Dr. Fitzgerald, after taking x-rays of Mr. Harding,

diagnosed him with osteoarthritis of the thumbs in addition to confirming his prior diagnosis of fibromyalgia. *Id.* ¶ 18. Dr. Fitzgerald believes Mr. Harding had osteoarthritis at least as far back as 2002 because "[u]sually to get these x-ray results that he [Mr. Harding] has, you would typically have that condition [osteoarthritis] for three to five years." *Dep. of Lisa Fitzgerald* at 62-63 (Docket # 30); PSMF ¶ 19; DRPSMF – Part II ¶ 19. According to Dr. Fitzgerald, Mr. Harding's difficulty grasping and exercising fine motor skills was actually attributable to his osteoarthritis, not his fibromyalgia. PSMF ¶ 20. Dr. Fitzgerald also opined that Mr. Harding's fibromyalgia condition remained largely unchanged from 2002 to 2005.[8] *Id.* ¶ 66.

In response to her findings of osteoarthritis and fibromyalgia, Dr. Fitzgerald imposed permanent restrictions with regard to Mr. Harding's activities. *Id.* ¶¶ 67, 77. She restricted Mr. Harding in the following ways: push/pull – not more than 21 minutes per hour; twist/bend – not more than 21 minutes per hour; stand/walk – not more than 21 minutes per hour; overhead work – not more than 9 minutes per hour; sit – not more than 21 minutes per hour; lift and carry less than 10 pounds – not more than 21 minutes per hour; lift and carry greater than 10 pounds – not more than 9 minutes per hour; and, climb – not more than 9 minutes per hour.[9, 10] *Dep. of Lisa Fitzgerald*, exh. 3 (attached to

---

[8] Some symptoms Mr. Harding described to Dr. Fitzgerald were: (1) diffused pain throughout his neck, spine, upper back, thoracic spine, lumbar spine, hip area and pelvis area; (2) aching, cramping, and stiffness which affected his day-to-day life; (3) numbness and tingling in his hands and some sharp shooting pain in his thumbs; and, (4) difficulty with prolonged driving. *Def.'s Stat. Mat. Facts* (DSMF) ¶¶ 270-72, 274 (Docket # 19); *Pl.'s Reply to Def.'s Stat. Mat. Facts* (PRDSMF) ¶ 272 (Docket # 48).

[9] Dr. Fitzgerald admitted that the "restrictions" placed on Mr. Harding are really "recommendations." She testified that Mr. Harding may be physically capable of performing the restricted activities for longer periods of time, but not without discomfort. *Dep. of Lisa Fitzgerald* at 37-38, 40 (Docket # 30); DRPSMF – Part II ¶¶ 76, 86, 88, 92, 101, 105, 109.

[10] Dr. Fitzgerald opined that the average person in the general population can walk for more than twenty-one minutes per hour; twist and bend to perform household chores for more than twenty-one minutes per hour; sit comfortably longer than Mr. Harding; drive longer than Mr. Harding without discomfort; and climb for more than nine minutes per hour. PSMF ¶¶ 87, 89, 102, 108, 111. Defendant objects to

Docket # 48); PSMF ¶¶ 76, 86, 88, 92, 101, 105, 109.   The restrictions upon Mr.

Harding's ability to lift, push, pull, bend, grasp, sit, stand, and engage in overhead work

limit him to performing sedentary or light work.   PSMF ¶ 78.   Cianbro has admitted that

Mr. Harding is no longer able to work as an electrician.   DRPSMF – Part II ¶ 114.   Dr.

Fitzgerald also concluded that Mr. Harding had a significant sleep disorder based upon

her review of his medical records, her own testing and examination, and Mr. Harding's

statements that he would only sleep three to four hours every six to eight hours he spent

in bed and, while in bed, he would wake up in pain and have to change position before

falling back to sleep.[11]  PSMF ¶ 73.

### D.  Cianbro's Knowledge of Mr. Harding's Physical Ailments

In the summer of 2002, approximately six weeks prior to Mr. Harding's

termination, Bill Marquis, a Cianbro Safety Manager, observed Mr. Harding limping.

PSMF ¶ 27; DRPSMF – Part II ¶ 27.   Mr. Marquis asked Mr. Harding if he had injured

himself on the job.   PSMF ¶ 28.   Mr. Harding responded that he had not been injured on

the job, but that the source of his limp was fibromyalgia.   *Id.* ¶ 29.   Mr. Marquis told Mr.

Harding that his wife also had fibromyalgia.   *Id.* ¶ 30.   Mr. Marquis inquired as to how

long Mr. Harding had been afflicted with fibromyalgia and Mr. Harding responded that

he had had the condition for more than seven years.   *Id.* ¶¶ 32, 33.   Mr. Marquis told Mr.

---

Plaintiff's statements of material fact 87, 89, 102, 108, and 111 for lack of foundation.   This Court overrules Defendant's objections.

[11] Defendant moves to strike Plaintiff's statements of material fact 93, 106, and 118 on the ground they are improper legal conclusions by an expert witness.   Plaintiff's statement of material fact 93 offers Dr. Fitzgerald's opinion that "the average person . . . can pick up objects like a cup of coffee or a pencil without difficulty and can do so for far longer than 9 minutes in an hour."   It also posits that the act of grasping implicates Mr. Harding's life activities.   Plaintiff's statement of material fact 106 offers Dr. Fitzgerald's opinion that Mr. Harding is "significantly impaired in his abilities to sit and stand compared to the general population."   Plaintiff's statement of material fact 118 posits that "Dr. Fitzgerald believes that Harding has a substantial disability due to the restrictions associated with his fibromyalgia, including chronic back pain and osteoarthritis."   This Court denies Defendant's motions to strike.

Harding that fibromyalgia was totally incapacitating to most people after eight to ten years and Mr. Harding responded that he was already aware of that. *Id.* ¶¶ 33, 34. Mr. Marquis subsequently researched fibromyalgia on the Internet and presented Mr. Harding with three pages of information within a week of their initial conversation. *Id.* ¶ 35. The research confirmed both Mr. Marquis' and Mr. Harding's mistaken belief that fibromyalgia is a progressive disease which renders its victims totally disabled within eight to ten years.[12] PSMF ¶¶ 36, 37. Mr. Marquis did not share his knowledge of Mr. Harding's condition with anyone else at Cianbro prior to Mr. Harding's termination.[13] DRPSMF – Part II ¶ 37A.

In early August 2002, approximately 1 ½ weeks after the conversation between Mr. Harding and Mr. Marquis, Nick Bell, Cianbro's Electrical Manager for the northern New England region, observed Mr. Harding having difficulty climbing stairs and struggling to walk from a job site to the parking lot. PSMF ¶ 38. Mr. Bell, noticing that Mr. Harding was in pain, offered Mr. Harding a ride home, which Mr. Harding declined. *Id.* ¶ 39. Mr. Bell subsequently followed Mr. Harding to Freeport, Maine, at which point Mr. Harding exited the highway to walk around. *Id.* Several days later, Mr. Harding disclosed to Mr. Bell that the source of his physical difficulties was fibromyalgia. *Id.* ¶¶

---

[12]      Defendant objects to Plaintiff's statements of material fact 30, 32-34, and 36-37 on the ground they are hearsay. Plaintiff's statements of material fact 30, 32-34, and 36-37, however, are not offered for their truth; rather, they are offered to show Defendant's knowledge of Mr. Harding's condition. This Court overrules Defendant's objections.

          Defendant also denies Plaintiff's statements of material fact 32-34 and 36-37. The portions of the record cited as support for Defendant's denials, however, do not contradict the disputed statements of material fact.

[13] Plaintiff contends that Mr. Marquis may have provided Cianbro with a written account of their conversation regarding his fibromyalgia "just before Cianbro terminated Plaintiff." PSMF ¶ 37A. This contention is based on Mr. Harding's deposition testimony about a later telephone conversation he had with Mr. Marquis. *See Dep. of Ronald Harding,* vol. 2 at 36 (Docket # 22). Mr. Harding testified that Mr. Marquis drafted and emailed a report regarding the conversation to Cianbro's Human Resources Manager, Gary Fitts. *Id.* The email to which Mr. Harding alludes, however, is attached as exhibit 6 to Mr. Marquis' deposition transcript. It was sent on April 21, 2003 – more than seven months after Mr. Harding's termination. *See Dep. of William Marquis*, exh. 6 (Docket # 27).

40, 41; DRPSMF – Part II ¶ 40.   Mr. Bell was unfamiliar with fibromyalgia and questioned Mr. Harding about the condition.   PSMF ¶ 42.   Mr. Harding explained that fibromyalgia causes muscle cramping and pain which, at times, prevented him from sitting, standing, and walking for too long; he also told Mr. Bell that it caused him difficulty in performing manual tasks such as picking up a cup of coffee or a pencil.   *Id.* ¶ 43.

Mr. Harding described to Mr. Bell a drive home from a Cianbro project in Glen Falls, New York.   *Id.* ¶ 44.   He told Mr. Bell he had to stop repeatedly to get out of the vehicle and drove with his forearms because he could not grasp the steering wheel due to cramps in his hands.[14]   *Id.*   Mr. Harding also told Mr. Bell that his fibromyalgia was the cause of his inability at times to sit through lengthy meetings conducted by Mr. Bell,[15] *id.* ¶ 45, and that eighty to eighty-five percent of persons with fibromyalgia become totally disabled within eight to ten years of the disease's onset.[16] *Id.* ¶ 46.

**E.  Mr. Harding's Troubles at Cianbro**

Mr. Harding did not always have a good work relationship with his Cianbro co-workers.   In the mid-1990s, for example, Mr. Harding worked as the Electrical Superintendent at Cianbro's Phoenix project in Jay, Maine.   *Def.'s Stat. Mat. Facts* (DSMF) ¶ 11 (Docket # 19); *Pl.'s Reply to Def.'s Stat. Mat. Facts* (PRDSMF) ¶ 11

---

[14] Defendant qualifies Plaintiff's statement of material fact 44 on the ground that Mr. Bell has no recollection of Mr. Harding having told this story.   This Court is obligated to view the evidence in a light most favorable to the non-moving party and assumes Mr. Harding described to Mr. Bell his drive from Glen Falls, New York to Maine.

[15] Defendant qualifies Plaintiff's statement of material fact 45 on the ground that Mr. Bell has no recollection of Mr. Harding having told him the cause of his difficulty sitting through lengthy meetings. This Court is obligated to view the evidence in a light most favorable to the non-moving party and assumes Mr. Harding told Mr. Bell that fibromyalgia was the cause of his difficulty in sitting through long meetings.

[16] Defendant qualifies Plaintiff's statement of material fact 46, in part on the ground that Mr. Bell has no recollection of Mr. Harding having told him this inaccurate information.   This Court is obligated to view the evidence in a light most favorable to the non-moving party and assumes Mr. Harding told Mr. Bell that eighty to eighty-five percent of persons afflicted with fibromyalgia become totally disabled in eight to ten years.

(Docket # 48).   While on that assignment, Mr. Harding reported to Mr. Bell, the Electrical Manager on the Phoenix project.[17]   DSMF ¶ 12.   During the project, Mr. Bell became upset with Mr. Harding due to his refusal to share an office trailer with the other electrical employees; rather than work in close proximity with the electrical group, Mr. Harding set up his own trailer.[18]   DSMF ¶ 17.   In addition to his insistence on working alone, Mr. Harding was involved in a physical altercation with a co-worker, and Mr. Bell felt Mr. Harding had some involvement in electrical installations that were not installed in accordance with specifications.   *Id.* ¶¶ 18-19, 22; PRDSMF ¶¶ 18-19, 22.   In Mr. Bell's view, Mr. Harding was reluctant to work with the rest of the electrical employees and, during the Phoenix project, "he was much more aggressive . . . with people in general" and Mr. Bell in particular, as well as "insubordinate to [Mr. Bell] a great deal of the time . . . maybe not directly, but indirectly."   *Dep. of Roland Nicholas Bell* at 94, 105 (Docket # 26); DSMF ¶ 29; PRDSMF ¶ 29.

Mr. Bell complained to Peter Schein, Cianbro's nationwide Electrical Manager, about Mr. Harding's use of a separate trailer at the Phoenix project.   DSMF ¶ 24; PRDSMF ¶ 24.   Mr. Schein understood that Mr. Bell felt Mr. Harding's use of the trailer was undermining his authority.   DSMF ¶ 28; PRDSMF ¶ 28.   Mr. Schein, however, sided with Mr. Harding; he believed it made sense for Mr. Harding to have his own trailer because there was limited space available in the office areas designated by Mr. Bell and it was reasonable to believe that Mr. Harding may have an "assistant superintendent or half

---

[17] Mr. Bell has been employed by Cianbro since 1984.  DSMF ¶ 2.  Peter Schein testified that there have been "hard feelings" between Mr. Harding and Mr. Bell for "all their [working] life," even before their employment at Cianbro, due to personality differences.  *Id.* ¶ 44.

[18] Although Plaintiff generally denied Defendant's statement of material fact 17, it appears he has not denied that Mr. Harding moved to his own trailer, since he adds Mr. Harding's reasons for doing so.  PRDSMF ¶ 17.

a dozen or a dozen foremen reporting to him." *Dep. of Peter Schein* at 62 (Docket # 20); DSMF ¶ 26; PRDSMF ¶ 26. According to Mr. Schein, with that many individuals moving in and out of the electrical group's office space, they would not have been able to hear each other. *Dep. of Peter Schein* at 63 (Docket # 20). Thus, in Mr. Schein's view, "what Mr. Harding did, even though Mr. Bell didn't like it, was a lot more efficient than being in the [electrical group's] trailer under direct supervision and control of Mr. Bell . . . ." *Id.* At the conclusion of the Phoenix project, Mr. Bell told a co-worker that he would never again work with Mr. Harding. DSMF ¶ 30; PRDSMF ¶ 30.

David Leavitt, Cianbro's Senior Project Manager in charge of the Phoenix project, found out after the Phoenix project that Mr. Harding was involved in a physical altercation with another Cianbro employee.[19] DSMF ¶ 32; PRDSMF ¶ 32. Had Mr.

---

[19]     Plaintiff moves to strike Defendant's statements of material fact 13, 23, 32-33, 100, 105-07, 111-12, 120, 125-28, 135, 146-47, 160-64, 218-19, and 225 (all of which are supported by the Declaration of David Leavitt), and the Declaration of David Leavitt (Docket # 35) in its entirety on the ground that Defendant "failed to disclose that Mr. Leavitt had discoverable information that Defendant might use to support its claims or defenses in its initial disclosure and did not reference him in response to interrogatories propounded by Plaintiff." PRDSMF ¶ 32; *see also Decl. of Jeffrey Neil Young* ¶ 2 (Docket # 50). Defendant responds that although it did not include Mr. Leavitt on its initial disclosures, he did appear on Plaintiff's Rule 26 disclosures. DRPSMF – Part I ¶ 32; *Decl. of Ella Brown* ¶ 2 (Docket # 74). Defendant also argues that Mr. Leavitt's name, his relationship with Plaintiff, and his role in Cianbro's decision to terminate Plaintiff were revealed during discovery. DRPSMF – Part I ¶ 32; *Decl. of Ella Brown* ¶ 3 (Docket # 74). On this basis, Defendant argues that it was not required to supplement its initial disclosures or answers to interrogatories to include Mr. Leavitt as an individual with discoverable information helpful to the defense.

Federal Rule of Civil Procedure 26(a) provides, in part:

(1) Initial Disclosures. Except in categories of proceedings specified in Rule 26(a)(1)(E) . . . a party must, without awaiting a discovery request, provide to other parties: (A) the name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subjects of the information . . . .

FED. R. CIV. P. 26(a)(1). Rule 26 also contains a subsection addressing parties' obligations to supplement disclosures and discovery responses:

(e) Supplementation of Disclosure and Responses. A party who has made a disclosure under subdivision (a) or responded to a request for discovery with a disclosure is under a duty to supplement or correct the disclosure or response to include information thereafter acquired if ordered by the court or in the following circumstances: (1) . . . if the party learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing . . . [; and,] (2) A party is under a

Leavitt known about the incident when it happened, he would have fired Mr. Harding on the spot.[20]  DSMF ¶ 33.

Mr. Bell was not the only Cianbro superior who felt that Mr. Harding undermined his authority.  In 1996 and 1997, Mr. Harding worked for Parker Hadlock, the Project Manager on Cianbro's Portland Bridge project.  DSMF ¶ 35; PRDSMF ¶ 35; DRPSMF – Part I ¶ 35.  Mr. Hadlock complained to Mr. Schein that Mr. Harding had undermined his authority by making inappropriate comments about his style of management in front of other employees and behind Mr. Hadlock's back.[21]  DSMF ¶ 37.  Mr. Schein approached Mr. Harding about this behavior and told him it was inappropriate.[22]  *Id.* ¶ 40.  As a result

---

> duty seasonably to amend a prior response to an interrogatory . . . if the party learns that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.

FED. R. CIV. P. 26(e)(1), (2).

> The Advisory Committee Notes for the 1993 Amendments to FED. R. CIV. P. 26(e) address this issue and militate against granting Plaintiff's motions to strike.  The notes provide, in pertinent part:
>
> > The obligation to supplement disclosures and discovery responses applies whenever a party learns that its prior disclosures or responses are in some material respect incomplete or incorrect.  *There is, however, no obligation to provide supplemental or corrective information that has been otherwise made known to the parties in writing or during the discovery process, as when a witness not previously disclosed is identified during the taking of a deposition* . . . .

FED. R. CIV. P. 26(e) advisory committee's note (emphasis supplied).  Here, the gravamen of Plaintiff's motions is that Defendant failed to disclose, in its initial disclosures and responses to Plaintiff's interrogatories, that Mr. Leavitt was an individual with discoverable information helpful to the defense.  The identity of and material information relating to Mr. Leavitt, however, was made known to Plaintiff's counsel during the course of discovery, including during the taking of depositions.  *Decl. of Ella Brown* ¶ 3 (Docket # 74); *see also Dep. of Ronald Harding*, vol. 1 at 156-57 (Docket # 21); *Dep. of William Marquis* at 36, 86-87 (Docket # 27); *Dep. of Roland Nicholas Bell* at 73-74, 150, 159-60, 203-04, 222-23, 225-26, 229 (Docket # 26); *Dep. of Ronald Nickerson* at 47 (Docket # 28); *Rule 36(b)(6) Dep. of Cianbro* at 51, 74-75, 103, 113.  In these circumstances, Defendant was not required to supplement its initial disclosures or answers to interrogatories and this Court denies Plaintiff's motions to strike.

[20] Plaintiff denies Defendant's statement of material fact 33.  Defendant's reference is to an Affidavit of Mr. Leavitt, Cianbro's Senior Project Manager in charge of the Phoenix project, and the statement is supported by the reference.  Plaintiff also moves to strike Defendant's statement of material fact 33 on the same ground as its request to strike Defendant's statement of material fact 32 and on the additional ground that it is based upon inadmissible speculation.  This court denies Plaintiff's motion.

[21] Plaintiff moves to strike Defendant's statement of material fact 37 on hearsay grounds.  This Court denies Plaintiff's motion.

[22] Plaintiff moves to strike Defendant's statement of material fact 40 on the ground that the foundation for the fact is based upon hearsay.  This Court denies Plaintiff's motion.

of Mr. Harding's conduct on the Portland Bridge project, Mr. Hadlock told Mr. Schein that he would not work with Mr. Harding again.[23]  *Id.* ¶ 38.

In November of 1999, Mr. Harding was assigned to a project at Independence Power Station in Veazie, Maine, where he reported to Scott Clements.  *Id.* ¶¶ 65, 66; PRDSMF ¶ 66.  Mr. Clements complained about Mr. Harding to Mr. Schein.[24]  DSMF ¶ 67; PRDSMF ¶ 67.  One complaint was that Mr. Harding did not do a good job with the heat trace portion of the work at the Veazie site.[25]  DSMF ¶ 68.  Another complaint was the placement of Mr. Harding's trailer.[26]  *Id.* ¶ 69; PRDSMF ¶ 69.  Mr. Schein, however, dismissed these complaints, explaining that the trailer location complaint did not make sense to him and that the heat trace portion of the job was very difficult.[27]  DSMF ¶ 70; PRDSMF ¶ 70.

After the Veazie project, Mr. Schein asked Mr. Hadlock if he would agree to work with Mr. Harding again at a project in Westbrook, Maine.  DSMF ¶ 74; PRDSMF ¶ 74.  Mr. Hadlock agreed and Mr. Harding joined the Cianbro employees in Westbrook.  DSMF ¶ 74.  When it came time for Mr. Hadlock (and perhaps others in Cianbro management) to review Mr. Harding, he rated him as a solid performer, an average score, and noted the following areas in which Mr. Harding needed improvement:  (1) "Don't select just the facts that support his position"; (2) "[r]esist the isolating, negative, non-

---

[23] Plaintiff moves to strike Defendant's statement of material fact 37 on hearsay grounds.  This Court denies Plaintiff's motion.

[24] Plaintiff moves to strike Defendant's statement of material fact 67 on hearsay grounds.  This Court denies Plaintiff's motion.

[25] Plaintiff moves to strike Defendant's statement of material fact 68 on hearsay grounds.  This Court denies Plaintiff's motion.

[26] Plaintiff moves to strike Defendant's statement of material fact 69 on hearsay grounds.  This Court denies Plaintiff's motion.

[27] Plaintiff moves to strike Defendant's statement of material fact 70 on the ground "there is no competent evidence in the record of complaints by Clements to Schein for the reasons set forth in response to DSMF ¶¶ 67-69." PRDSMF ¶ 70.  As this Court has denied Plaintiff's motions to strike Defendant's statements of material fact 67-69, this Court denies Plaintiff's motion.

communicative approach to his business partners"; (3) "[b]e forgiving of others' mistakes"; (4) "[c]ommunicate effectively 3 ways:  listen, think objectively, [and] speak"; and, (5) "[s]how support in equal doses to constructive criticism."  *Id.* ¶ 76; PRDSMF ¶ 76.  Also included in the review was a section entitled "Career Development Plan," which advised that Mr. Harding's "single focus should be on regaining the respect of his business partners through positive, cooperative, constructive dialogue."  DSMF ¶ 77; PRDSMF ¶ 77.

In December, 2000, Mr. Harding was assigned to the No. 11 Paper Mill project in Millinocket, Maine.  Frank Susi, who was a Cianbro Project Manager, had to convince Peter Foster and Mr. Clements, who were in charge of the site, to take Mr. Harding.[28]  DSMF ¶ 83.  At some point after Mr. Harding began work at the site, Mr. Foster, the Project Manager, contacted Mr. Bell to ask him if he would be willing to take over the electrical superintendent duties should Mr. Harding be relieved of his position.[29]  *Id.* ¶ 85.  Mr. Foster told Mr. Bell that Mr. Harding was uncooperative and insubordinate and he did not trust him.[30]  *Id.* ¶ 86.

In April, 2001, Mr. Schein retired as Cianbro's Electrical Manager for the northern New England region.  *Id.* ¶ 87.  Mr. Bell was appointed as his replacement.  *Id.* Shortly thereafter, Mr. Bell visited the No. 11 Paper Mill project where Mr. Harding was

---

[28] Plaintiff denies Defendant's statement of material fact 83.  Defendant's reference is to an Affidavit of Mr. Susi, a Cianbro Senior Project Manager, and the statement is supported by the reference.  Moreover, Plaintiff's record citation in support of its denial does not contradict Defendant's statement of material fact 83.  This Court overrules Plaintiff's denial.

[29] Plaintiff denies Defendant's statement of material fact 85.  Defendant's reference is to Mr. Bell's deposition and the statement is supported by the reference.  Moreover, Plaintiff's record citations do not contradict Defendant's statement.   Plaintiff also moves to strike Defendant's statement of material fact 85 on hearsay grounds.  This Court denies Plaintiff's motion.

[30] Plaintiff denies Defendant's statement of material fact 86.  Defendant's reference is to Mr. Bell's deposition and the statement is supported by the reference.  Moreover, Plaintiff's record citations do not contradict Defendant's statement.   Plaintiff also moves to strike Defendant's statement of material fact 86 on hearsay grounds.  This Court denies Plaintiff's motion.

working. *Id.* ¶ 88.  Mr. Harding met with Mr. Bell and asked whether he said he would

never work with Mr. Harding again after their differences on the Phoenix project. *Id.* ¶¶

88-89.  Mr. Bell confirmed that he had made that statement, but told Mr. Harding that he

was willing to put the past behind them and give Mr. Harding another chance.  DSMF ¶¶

90-91; PRDSMF ¶¶ 90-91.  Mr. Harding was relieved to learn that Mr. Bell felt the two

of them could work together.  DSMF ¶ 92.

Mr. Harding worked on the No. 11 Paper Mill project until its conclusion. *Id.* ¶

96.  After a short assignment, he took some time off. *Id.* ¶ 97.  In March, 2002, Mr. Bell

assigned Mr. Harding to a project in Pittsfield, Maine, then to the Portland Pipeline Pier

project for two weeks, and later to Cianbro's Amethyst project which involved the

construction of off-shore oil rigs in Portland Harbor. *Id.* ¶¶ 98-99.  Mr. Harding's

assignment to the Amethyst project occurred approximately one year after his

conversation with Mr. Bell at the No. 11 Paper Mill project in Millinocket. *Id.* ¶¶ 87-88,

99.

Mr. Leavitt, who had been in charge of the Phoenix project in the mid-1990s, was

also in charge of the Amethyst project. *Id.* ¶ 100.  When Mr. Harding began work at the

Amethyst project, he reported to Jamie Marquis. *Id.* ¶ 103.  Mr. Schein was also present

at the site, having been brought out of retirement by Mr. Hadlock to serve as a part-time

electrical consultant.[31] *Id.* ¶ 111.  Mr. Leavitt did not believe Mr. Schein was necessary

because, in his opinion, there were enough Cianbro electrical workers at the site to

complete the work; he expressed this view to Mr. Hadlock on more than one occasion.

*Id.* ¶ 112.

---

[31] Mr. Hadlock was the Construction Manager of the Amethyst project.  DSMF ¶ 105.

As of June, 2002, Mr. Bell was in charge of all electrical operations at the Amethyst project. *Id.* ¶ 108.  In that capacity, Mr. Bell supervised all electrical group workers, which included Mr. Harding and Mr. Schein. *Id.*  Initially, Mr. Harding worked on designing temporary power for the project and the project warehouse. *Id.* ¶ 115.  At that point, Mr. Bell felt that Mr. Harding was doing a good job. *Id.*

Mr. Schein quit the Amethyst project in July 2002. *Id.* ¶ 141; PRDSMF ¶ 141. Although he testified there were no hard feelings with respect to his departure, Mr. Harding and Mr. Bell remembered otherwise.[32]  According to Mr. Bell's account, he explained to Mr. Schein that, like the rest of the crew, he needed to arrive at the work site at 6:00 or 6:30 a.m. and to remain there until the end of the work day. *Dep. of Roland Nicholas Bell* at 193 (Docket # 26); PRDSMF ¶ 141.  Mr. Schein, however, felt that as a consultant he need not work the hours expected of Cianbro's full-time employees. *Dep. of Roland Nicholas Bell* at 193 (Docket # 26); PRDSMF ¶ 141.  At the conclusion of the conversation, Mr. Schein stated, "I think my work is done here," and Mr. Bell responded, "I believe it is." *Dep. of Roland Nicholas Bell* at 194-95 (Docket # 26); PRDSMF ¶ 141. On the day Mr. Schein quit the Amethyst project, he told Mr. Harding to watch what he said or he would find himself without a job at Cianbro.  DSMF ¶ 148.  The basis for Mr. Schein's comment was his feeling that Mr. Bell did not like Mr. Harding and was looking for an excuse to fire him. *Dep. of Peter Schein* at 77-79 (Docket # 20); DSMF ¶ 148.

Later that month, Mr. Marquis – Mr. Harding's direct supervisor on the Amethyst Project – went to Mr. Bell with "tears streaming down his face yelling and screaming" because Mr. Harding had called him a "wingnut" roughly "half a dozen times."  DSMF ¶

---

[32] According to Mr. Harding, who overheard the conversation between Mr. Schein and Mr. Bell, Mr. Schein quit when Mr. Bell exclaimed "[i]f you can't fucking work like the rest of us, then leave." *Dep. of Ronald Harding*, vol. 1 at 22 (Docket # 21); PRDSMF ¶ 141.

169; PRDSMF ¶ 169.   Mr. Bell spoke to Mr. Harding about the situation and Mr. Harding apologized to Mr. Marquis.   DSMF ¶¶ 171-73; PRDSMF ¶¶ 171-73.

Mr. Harding's confrontations with Cianbro employees, however, continued beyond his confrontation with Mr. Marquis.[33]   Ron Nickerson, another Cianbro electrical worker, approached Mr. Leavitt during the Amethyst project and informed him of an issue between Mr. Harding and a Cianbro General Foreman, Martin Roach.[34]   DSMF ¶ 218; PRDSMF ¶ 218.   Mr. Leavitt approached Mr. Bell about the situation, and Mr. Bell spoke with Mr. Roach.   DSMF ¶ 221; PRDSMF ¶ 221.   According to Mr. Roach, two of his crew members, Al Smith and Ron Taylor, informed him that Mr. Harding was (1) re-directing them despite the fact that Mr. Roach had made it clear to them that they were supposed to take direction only from him and Mr. Nickerson; and, (2) "bad-mouthing" Mr. Roach, Mr. Nickerson, and Mr. Bell by criticizing the way they had approached the

---

[33] According to Mr. Leavitt, Mr. Harding also had performance-based problems unrelated to his behavior. Mr. Leavitt claims that he personally instructed both Mr. Bell and Mr. Harding to put a portal crane feeder cable on the roof of a utility shed at the Amethyst project.   DSMF ¶ 121; *Decl. of David Leavitt* ¶ 6 (Docket # 35).   Mr. Harding denies that Mr. Leavitt personally instructed him to do so.   PRDSMF ¶ 121; *Decl. of Ronald Harding* ¶ 32 (Docket # 51).   The cable was to be installed on the roof for safety purposes.   DSMF ¶ 121.   Mr. Harding, however, installed the cable on the ground, where it could be walked on or driven over.   *Decl. of David Leavitt* ¶ 6 (Docket # 35).   In the end, the cable was moved at a $10,000 to $20,000 cost to Cianbro.   DSMF ¶ 135; PRDSMF ¶ 135.   When Mr. Leavitt discovered that Mr. Harding had installed the cable on the ground despite his instructions to the contrary, he told Mr. Bell he could fire Mr. Harding "the very next time Ron gave him any kind of trouble."   *Decl. of David Leavitt* ¶ 7 (Docket # 35); DSMF ¶ 128.   Mr. Harding denies he did anything other than what he was told with respect to the portal crane and feeder; however, he does not deny that Mr. Leavitt told Mr. Bell he could fire Mr. Harding in the future.   PRDSMF ¶ 128.   To the extent this dispute is material, its resolution is for the fact finder and at this stage, this Court must view disputed evidence in a light most favorable to the Plaintiff.

[34] Plaintiff moves to strike Defendant's statements of material fact 79-82, 84, 210-14 (all of which are supported by the Declaration of Martin Roach), and the Declaration of Martin Roach (Docket # 34) in its entirety on the ground that Defendant "failed to disclose that [Mr.] Roach had discoverable information that Defendant might use to support its claims or defenses in its Rule 26 Disclosure and did not reference him in response to interrogatories propounded by Plaintiff."   PRDSMF ¶ 210; *see also Decl. of Jeffrey Neil Young* ¶ 2 (Docket # 50).   With respect to Defendant's statements of material fact 210-14, Plaintiff further alleges that Cianbro failed to provide details and examples of any problems between Mr. Roach and Mr. Harding at its Rule 30(b)(6) deposition.   This Court denies Plaintiff's motions for the same reasons set forth in footnote 18, *supra*.

work on one of the oil rigs and Mr. Bell's handling of the entire site.[35]  DSMF ¶ 211.  Mr.

Roach also told Mr. Bell he found Mr. Harding "unbearable to work with" and believed

Mr. "Harding was a major impediment to getting the work done . . . ."[36]  *Decl. of Martin*

*Roach* ¶ 3 (Docket # 34); DSMF ¶ 214.

### F.  Mr. Harding's Termination and the Charge of Disability Discrimination

On September 9, 2002, approximately four to five weeks after Mr. Harding

advised Mr. Bell of his fibromyalgia, Mr. Bell terminated him for having a "bad

attitude."[37]  PSMF ¶ 50.  Pursuant to Cianbro's internal grievance procedure, Mr.

Harding appealed the termination to Peter Vigue, Cianbro's President, and Mac

Cianchette, Cianbro's Vice President of Operations.  *Id.* ¶ 53.  Mr. Harding expressed to

Mr. Vigue and Mr. Cianchette his belief that he had been discriminated against because

of his fibromyalgia and provided a list of thirty to forty names of persons he wanted them

to speak to regarding his "bad attitude."[38]  *Id.* ¶ 54.  Mr. Cianchette, however, informed

Mr. Harding that he only spoke to Mr. Bell and Frank Susi about the termination.[39]  *Id.* ¶

---

[35] Plaintiff denies Defendant's statement of material fact 211.  Defendant's reference is to the Declaration of Martin Roach and the statement is supported by the reference.  Moreover, Plaintiff's record citations do not contradict Defendant's statement.  This Court overrules Plaintiff's denial.

[36] Plaintiff denies Defendant's statement of material fact 214 insofar as it suggests that Mr. Roach approached Mr. Bell about his problems with Mr. Harding.  This Court is obligated to view the facts in a light most favorable to the Plaintiff and has adopted Plaintiff's version that it was Mr. Bell who approached Mr. Roach about the problems between Mr. Roach and Mr. Harding.

[37] Defendant qualifies Plaintiff's statement of material fact 50, asserting that Mr. Bell recalls telling Mr. Harding there were issues "with his behavior towards other people, being insubordinate, particularly over the crane issue, and . . . lateness, not coming to [his] meetings, not wanting to come to meetings, those things."  DRPSMF – Part II ¶ 50.  This Court is obligated to view the evidence in a light most favorable to the non-moving party and assumes Mr. Bell told Mr. Harding his termination was a result of his "bad attitude."

[38] Defendant denies so much of Plaintiff's statement of material fact 54 as alleges Mr. Harding told Mr. Vigue and Mr. Cianchette that he felt he had been discriminated against on the basis of fibromyalgia. DRPSMF – Part II ¶ 54 (citing *Decl. of Mac Cianchette* ¶ 2 (Docket # 73)).  This Court is obligated to view the evidence in a light most favorable to the non-moving party and assumes Mr. Harding did so.  *See Decl. of Ronald Harding* ¶ 4 (Docket # 51).

[39] Defendant objects to Plaintiff's statement of material fact 56 on hearsay grounds.  This Court overrules Defendant's objection because the statement is an admission by a party opponent.  *See* FED. R. EVID. 801(d)(2).

56.   Moreover, Mr. Vigue and Mr. Cianchette never reported Mr. Harding's claim of discrimination to Cianbro's Human Resources Manager, Gary Fitts, and Cianbro never investigated the claim.  *Id.* ¶ 55.

In November 2002, Mr. Harding found employment with S&L Construction.  *Id.* ¶ 57.  That company, however, ceased doing business in February 2003 when Cianbro purchased some of its assets.  *Id.* ¶ 58.   Before S&L closed its doors, Mr. Fitts interviewed a number of its employees for positions with Cianbro; Mr. Harding, however, was not among the S&L employees interviewed.  *Id.* ¶ 60; DRPSMF – Part II ¶ 60.  Although Mr. Harding claims the reason he failed to interview with Mr. Fitts was that Mr. Fitts left the premises before he had an opportunity to interview, it is undisputed that Mr. Harding never requested nor completed a Cianbro employment application. DSMF ¶ 255; PRDSMF ¶ 255.

On February 19, 2003, Mr. Harding filed a charge of disability discrimination against Cianbro with the Equal Employment Opportunity Commission (EEOC) and the Maine Human Rights Commission (MHRC).  PSMF ¶ 61.  By letter dated June 30, 2004, the MHRC rejected Mr. Harding's claims and found no reasonable grounds to believe discrimination had occurred.  *Id.* ¶ 62; DSMF ¶ 311.  On September 8, 2004, Mr. Harding requested a right-to-sue letter from the EEOC and he instituted this action on September 9, 2004.  PSMF ¶ 63.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to . .

. judgment as a matter of law." FED. R. CIV. P. 56(c); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004). Summary judgment may enter when a plaintiff fails to show sufficient evidence to establish an essential element of his case on which he bears the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Once the movant avers 'an absence of evidence to support the nonmoving party's case,' the latter must adduce specific facts establishing the existence of at least one issue that is both 'genuine' and 'material.'" *Sheinkopf v. Stone*, 927 F.2d 1259, 1261 (1st Cir. 1991) (citations omitted). A fact is "material" if it has the "'potential to affect the outcome of the suit under the applicable law.'" *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir. 2000) (quoting *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996)). For an issue to be "genuine," the evidence relevant to the issue, viewed in the light most flattering to the nonmoving party, must be "sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir. 1995) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). "[C]onclusory allegations, improbable inferences, and unsupported speculation," are insufficient to establish a genuine dispute of fact. *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990). Rather, "[t]he evidence illustrating the factual controversy . . . must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve . . . ." *Mack v. Great Atl. & Pac. Tea Co., Inc.*, 871 F.2d 179, 181 (1st. Cir. 1989) (citing *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir. 1975)).

## III. DISCUSSION

In Counts I and III of the First Amended Complaint, Mr. Harding alleges that Cianbro intentionally and wrongfully discriminated against him on the basis of his disability in violation of the ADA and Rehabilitation Act when it terminated him because of his disability. *First Amend. Compl.* ¶¶ 24, 30. Cianbro's response is three-pronged: (1) Mr. Harding is not disabled as that term is defined by the ADA and Rehabilitation Act; (2) Cianbro had a legitimate, non-discriminatory reason for terminating Mr. Harding; and, (3) there is no evidence that Cianbro's justification for terminating Mr. Harding was mere pretext for discrimination.

Where there is no direct evidence of discrimination, courts are directed to utilize the familiar burden-shifting paradigm outlined by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), in evaluating disability discrimination claims under Title I of the ADA[40] and section 504 of the Rehabilitation Act.[41] *See Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 264 (1st Cir. 1999) (approving use of *McDonnell Douglas* framework in connection with ADA claims of disability discrimination). To establish a prima facie case under the ADA and Rehabilitation Act, Mr. Harding "must prove by a preponderance of the evidence: first, 'that [he] was disabled within the meaning of the Act[s]; second, . . . that with or without reasonable accommodation [he] was a qualified individual able to perform the essential functions of the job; and third, . . . that [Cianbro] discharged [him] because of [his] disability.'" *Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 646 (1st Cir. 2000) (quoting

---

[40] Title I of the ADA prohibits employers from discriminating against a "'qualified individual with a disability because of the disability.'" *Guzman-Rosario v. United Parcel Serv., Inc.*, 397 F.3d 6, 8 n.1 (1st Cir. 2005) (quoting 42 U.S.C. § 12112(a)).

[41] Section 504 of the Rehabilitation Act is construed as congruent with Title I of the ADA and "needs no separate treatment." *Id.* (citing *Oliveras-Sifre v. P.R. Dep't of Health*, 214 F.3d 23, 25 n.2 (1st Cir. 2000)); *see also Silk v. City of Chicago*, 194 F.3d 788, 797 n.7 (7th Cir. 1999).

*Criado v. IBM Corp.*, 145 F.3d 437, 441 (1st Cir. 1998)); *see also Lessard v. Osram Sylvania, Inc.*, 175 F.3d 193, 197 (1st Cir. 1999); *Pouliot v. Town of Fairfield*, 226 F. Supp. 2d 233, 241 (D. Me. 2002) (quoting *Soileau v. Guilford of Maine, Inc.*, 928 F. Supp. 37, 46 (D. Me. 1996), *aff'd*, 105 F.3d 12 (1st Cir. 1997)).  If Mr. Harding does so, an inference of intentional discrimination is raised and the burden of production shifts to Cianbro to articulate a legitimate, non-discriminatory reason for its employment decision. *Ingram v. Brink's, Inc.*, 414 F.3d 222, 230 (1st Cir. 2005); *McDonnell Douglas Corp.*, 411 U.S. at 802.  Finally, if Cianbro does so, the burden of production shifts back to Mr. Harding, and he must proffer evidence to establish that Cianbro's non-discriminatory justification is mere pretext, cloaking discriminatory animus.  *Ingram*, 414 F.3d at 230; *McDonnell Douglas Corp.*, 411 U.S. at 804.  Should Mr. Harding fail "to make it past the first stage, *i.e.*, to aver a prima facie case, the inference of discrimination simply never arises and the employer's motion for summary judgment is granted."  *Ingram*, 414 F.3d at 230.

### A.  Step One:  Disability

To establish a prima facie case, Mr. Harding must first prove that he has a "disability" as defined by the ADA and Rehabilitation Act.  "The word 'disability' is a term of art in the ADA context."  *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 21 (1st Cir. 2002).  The statute offers three definitions:  "a person is considered disabled if [he] suffers from 'a physical or mental impairment that substantially limits one or more of [his] major life activities,' 42 U.S.C. § 12102(2)(A); is stigmatized by 'a record of such an impairment,' *id.* § 12102(2)(B); or is 'regarded as having such an impairment,' *id.* § 12102(2)(C)."  *Gillen*, 283 F.3d at 21.  Mr. Harding first argues that he has a

"disability" under subdivision (A) of the ADA's definition; that is, he contends he suffers from physical impairments that substantially limit certain of his major life activities. *Pl.'s Opp. to Def.'s Mot. for Summ. Judg.* at 5-21 (Docket # 47).

The ADA defines neither "substantially limits" nor "major life activities," but EEOC regulations provide significant guidance.[42]   *See* 29 C.F.R. § 1630.2(g)-(l).  These regulations adopt the same definition of "major life activities" used in the Rehabilitation Act.  *Bolton v. Scrivner, Inc.*, 36 F.3d 939, 942-43 (10th Cir. 1994).  The EEOC has interpreted "major life activities" to include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working."   29 C.F.R. § 1630.2(i).   In addition, an EEOC interpretive guidance accompanying the regulations notes that the list contained in 29 C.F.R. § 1630.2(i) is not exclusive and adds sitting, standing, reaching, and lifting to the catalog of potential major life activities.  *Id.* pt. 1630, App. § 1630.2(i).

The EEOC has interpreted the phrase "substantially limits" in the context of 42 U.S.C. § 12102(2)(A) to mean:

> (i)     Unable to perform a major life activity that the average person in the general population can perform; or
>
> (ii)    Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1).   The EEOC has recommended that courts, applying the "substantially limits" standard, "consider the nature and severity of the impairment, its expected duration, and its permanent or long-term impact."  *Gillen*, 283 F.3d at 21 (citing

---

[42] Although no agency has authority to issue binding regulations interpreting the term "disability" in the ADA and Rehabilitation Act, see *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 194 (2002), the First Circuit "regularly consult[s] EEOC definitions of [ADA] terms."  *Guzman-Rosario*, 397 F.3d at 9 (citing *Wright v. CompUSA, Inc.*, 352 F.3d 472, 476 (1st Cir. 2003)).

29 C.F.R. § 1630.2(j)(2)); *see also Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198 (2002) (noting that in order for an impairment to be "substantially limit[ing]," it must be "permanent or long term").

In *Toyota*, the Supreme Court stated that these terms are to be "interpreted strictly to create a demanding standard for qualifying as disabled." 534 U.S. at 197. *Toyota* explained:

> When it enacted the ADA in 1990, Congress found that "some 43,000,000 Americans have one or more physical or mental disabilities." [42 U.S.C.] § 12101(a)(1). If Congress intended everyone with a physical impairment that precluded the performance of some isolated, unimportant, or particularly difficult manual task to qualify as disabled, the number of disabled Americans would surely have been much higher.
>
> We therefore hold that to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long term. *See* 29 C.F.R. §§ 1630.2(j)(2)(ii)-(iii) (2001).

*Id.* at 197-98.

Moreover, "[i]t is insufficient for individuals attempting to prove disability . . . to merely submit evidence of a medical diagnosis of an impairment"; rather, "the ADA requires those 'claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial.'" *Id.* at 198 (quoting *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567 (1999)) (holding that monocular vision is not invariably a disability, but must be analyzed on an individual basis, taking into account the individual's ability to compensate for the impairment). Whether an individual has a "disability," therefore, must be determined on a case-by-case basis. *Id.*

The Supreme Court has outlined a three-step process for determining whether a plaintiff has a disability under 42 U.S.C. § 12102(2)(A).  The process requires this Court to determine:  (1) whether Mr. Harding has a physical or mental impairment; (2) whether the activities allegedly limited by the impairment are major life activities within the meaning of the ADA; and, (3) whether the impairment substantially limits the major life activities.  *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998); *see also Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 20 (1st Cir. 2004).   The burden is on Mr. Harding to establish all three elements.  *Bailey v. Georgia-Pacific Corp.*, 306 F.3d 1162, 1167 (1st Cir. 2002).

### 1. Impairment

The EEOC regulations interpreting the ADA define "physical or mental impairment" as follows:

> (1) Any psychological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitor-urinary, hemic and lymphatic, skin, and endocrine; or
>
> (2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h)(1), (2).  Cianbro concedes that at least fibromyalgia qualifies as a "physical impairment" for purposes of the ADA and Rehabilitation Act analysis.  *Def.'s Mot. for Summ. Judg.* at 10 (Docket # 18) ("Harding's fibromyalgia . . . is a physical impairment.").  Other courts have also found fibromyalgia to be a physical impairment.  *See, e.g., Caroselli v. Allstate Ins. Co.*, No. 01-C-6834, 2004 WL 407004, at *2 (N.D. Ill. Feb. 23, 2004) (unpublished opinion) (accepting defendant's concession that

fibromyalgia is a physical impairment); *Falor v. Livingston County Cmty. Mental Health*, No. 5:02-CV-60, 2003 WL 21684183, at *4 (W.D. Mich. May 30, 2003) (unpublished opinion) ("[The defendant] does not dispute that fibromyalgia constitutes a physical impairment, and the Court finds no reason to conclude that fibromyalgia is not a physical impairment."); *Jackson v. City of Chicago*, 293 F. Supp. 2d 836, 840 (N.D. Ill. 2003), *aff'd*, 414 F.3d 806 (7th Cir. 2005) (recognizing fibromyalgia as a physical impairment); *Mincey v. Dow Chemical Co.*, 217 F. Supp. 2d 737, 742 (M.D. La. 2002) ("[I]t is clear that the fibromyalgia suffered by the plaintiff herein is an impairment.").  Based on its independent review of the record and Cianbro's concession, this Court concludes that Mr. Harding's fibromyalgia is a physical impairment within the meaning of the ADA and Rehabilitation Act.

### 2.  Major Life Activities

The second step is to identify the life activities affected by the impairment, and to determine whether those activities are "major" life activities under the ADA and Rehabilitation Act.  *Bragdon*, 524 U.S. at 631.  Mr. Harding contends that his physical impairments substantially limit the activities of sleeping, lifting, walking, bending and twisting, grasping and performing manual tasks, sitting and standing, driving, climbing, and working.

The First Circuit has recognized lifting, sleeping, walking,[43] and bending[44] as major life activities, see *Gillen*, 283 F.3d at 21; *Criado v. IBM Corp.*, 145 F.3d 437, 442-43 (1st Cir. 1998); *Cook v. R.I. Dep't of Mental Health, Retardation, and Hosp.*, 10 F.3d 17, 25 (1st Cir. 1993), and has assumed, without deciding, that working is also a major life activity. *Guzman-Rosario*, 397 F.3d at 11 ("Awaiting a definitive ruling from the Supreme Court otherwise, we have assumed that 'working' is a major life activity . . . ."); *Sullivan v. Neiman Marcus Group, Inc.*, 358 F.3d 110, 115 (1st Cir. 2004) ("We will, as we have done in the past, assume without deciding that work may constitute a major life activity."); *see Sutton v. United Airlines, Inc.*, 527 U.S. 471, 492 (1999) (noting that "working" is to be considered a "major life activity" only "'[i]f an individual is not substantially limited with respect to *any other* major life activity.'" (quoting 29 C.F.R. pt. 1630, App. § 1630.2(j)) (emphasis in original)). The Supreme Court and the EEOC have recognized the performance of certain manual tasks as major life activities. *See* 29 C.F.R. § 1630.2(i); *Toyota*, 534 U.S. at 201-02 (noting that manual tasks central to most people's lives, such as "household chores, bathing, and brushing one's teeth" constitute major life activities).[45]

---

[43] This Court has also recognized walking as a major life activity. *Dudley v. Hannaford Bros., Inc.*, 190 F. Supp. 2d 69, 74 (D. Me. 2002).

[44] In *Cook v. R.I. Dep't of Mental Health, Retardation, and Hosp.*, the First Circuit stated: "In this case, Dr. O'Brien testified that he refused to hire plaintiff because he believed that her morbid obesity interfered with her ability to undertake physical activities, including walking, lifting, *bending*, stooping, and kneeling . . . . On this basis alone, the jury plausibly could have found that MHRH viewed plaintiff's suspected impairment as interfering with *major life activities*." 10 F.3d 17, 25 (1st Cir. 1993) (citation omitted) (emphasis supplied). In *Cook*, the First Circuit appears to have recognized bending as a major life activity. While it is true, as Cianbro points out, that *Cook* was decided before *Toyota*, this Court accepts Mr. Harding's contention that the ability to bend is of "central importance" to most people's daily lives.

[45] Cianbro argues that Mr. Harding is only limited in performing manual tasks associated with his former occupation as an electrician. *Def.'s Rep. to Pl.'s Opp. to Mot. for Summ. Judg.* at 6-7 (Docket # 67). It points out that *Toyota* warned against classifying manual tasks associated only with a particular job as major life activities. The record, however, reflects Mr. Harding's difficulties in performing manual tasks not associated with a particular job, such as "picking up a cup of coffee or a pencil" and grasping the steering wheel in a vehicle. *See* PSMF ¶¶ 43-44. This Court concludes that such manual tasks are of

That leaves sitting and standing, driving, and climbing.  This Court concludes that sitting and standing constitute major life activities.  Although neither the First Circuit nor this Court has directly addressed this issue, both have suggested that sitting and standing constitute major life activities.  *See Gillen*, 283 F.3d at 21 (citing 29 C.F.R. pt. 1630, App. § 1630.2(i)) (including sitting and standing within the catalog of potential major life activities); *Sevigny v. Me. Educ. Ass'n – Nat'l Educ. Ass'n*, No. 98-0090-B, 1999 WL 1995208, at *2 (D. Me. June 14, 1999) (unpublished opinion) (citing *DeMar v. Car-Freshner Corp.*, 49 F. Supp. 2d 84, 90 (N.D.N.Y. 1999)) (noting, in a case involving ADHD, that sitting and standing are considered major life activities even though they are not listed in the statute).  Moreover, every circuit court that has considered whether sitting and standing constitute major life activities has determined that they do.  *DePrisco v. Delta Air Lines, Inc.*, 90 Fed. Appx. 790, 795 (6th Cir. 2004); *Davoll v. Webb*, 194 F.3d 1116, 1134 (10th Cir. 1999); *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 185 (3d Cir. 1999); *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 870 (2d Cir. 1998); *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 n.7 (5th Cir. 1995); *Oesterling v. Walters*, 760 F.2d 859, 861 (8th Cir. 1985) ("it seems beyond dispute that standing and sitting are major life activities").

Neither the First Circuit nor this Court has addressed whether climbing is a major life activity.  *See Davis v. Emery Worldwide Corp.*, 267 F. Supp. 2d 109, 128 (D. Me. 2003) (finding it unnecessary to decide the question).  Mr. Harding cites one pre-*Toyota* case for the proposition that climbing constitutes a major life activity.  *See Nodelman v. Gruner & Jahr USA Publ'g*, No. 98-CIV-1231 (LMM), 2000 WL 502858, at *7

---

central importance to most people's daily lives and fit comfortably within the definition of a major life activity as judicially interpreted and constrained.

(S.D.N.Y. April 26, 2000) (unpublished opinion).  The weight of authority, however, is contrary to Mr. Harding's position.  *See, e.g., Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 758 n.2 (5th Cir. 1996) ("Climbing is not such a basic, necessary function and this court does not consider it to qualify as a major life activity under the ADA."); *Peralta v. Avondale Indus.*, No. Civ.A.-03-1768, 2004 WL 2534168, at *3 (E.D. La. Nov. 8, 2004) (unpublished opinion) ("Climbing is not a major life activity under the ADA."); *Sussle v. Sirina Prot. Sys. Corp.*, 269 F. Supp. 2d 285, 312 (S.D.N.Y. 2003) (collecting cases); *Piascyk v. City of New Haven*, 64 F. Supp. 2d 19, 26 (D. Conn. 1999) (collecting cases).  This Court concludes that under the standard announced in *Toyota*, as well as pre-and-post-*Toyota* case law, climbing is not a major life activity for purposes of the ADA and Rehabilitation Act.

Neither the First Circuit nor this Court has addressed whether driving is a major life activity.  *See Guzman-Rosario*, 397 F.3d at 11; *Acevedo Lopez v. Police Dep't of P.R.*, 247 F.3d 26, 27 (1st Cir. 2001).  A number of courts have intimated that driving is a major life activity.  *See, e.g., Anderson v. N.D. State Hosp.*, 232 F.3d 634, 636 (8th Cir. 2000) ("While working is clearly a major life activity, the matter of driving is not so obvious.  We give [plaintiff] the benefit of the doubt, however, and assume that both driving and working are major life activities." (citations omitted)); *Arnold v. County of Cook*, 220 F. Supp. 2d 893, 895 n.3 (N.D. Ill. 2002);[46] *Weiss-Clark v. Kaiser Found.*

---

[46] In *Arnold*, Judge Gottschall discussed what he described as "compelling reasons to think that driving should qualify as a major life activity":

> Driving appears to be "of central importance to most people's daily lives." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184 (2002).  In 1995, 91% of workers used an automobile to get to work. U.S. Census Bureau, *Statistical Abstract of the United States: 2001*, tbl. 1091, at 693.  Approximately 85% of Americans aged 15 or older were licensed drivers in 2000.  *See id.* tbl. 1087, at 681; U.S. Census Bureau, *General Characteristics of United States*, http://factfinder.census.gov (last visited Aug. 27, 2002).  Although the Second Circuit once stated that driving is not "major league," *Colwell v.*

*Health Plan of the Nw*, No. CV 99-1083-BR, 2001 WL 204823, at *3 (D. Or. Feb. 7, 2001) (unpublished opinion) ("Plaintiff has raised a question of fact as to whether she suffers from an injury that affects a major life activity, specifically the life activities of . . . driving . . . ."); *United States v. City and County of Denver*, 49 F. Supp. 2d 1233, 1253 (D. Colo. 1999); *Norris v. Allied-Sysco Food Serv., Inc.*, 948 F. Supp. 1418, 1434 n.13 (N.D. Cal. 1996) ("[T]he jury could have felt that, at least in California, driving is a major life activity.").

Notably, the courts within the Districts of Massachusetts and Puerto Rico have declined to consider driving a major life activity in its own right. *Tebo v. Potter*, 345 F. Supp. 2d 61, 66-67 (D. Mass. 2004) ("Plaintiff has not identified any First Circuit precedent that holds that driving is itself a major life activity and it is not clear whether the First Circuit Court of Appeals would so hold.  Without such precedent, this Court will not hold that driving qualifies as a major life activity, but will consider [plaintiff's] inability to drive as subsumed within his limitation on working." (citations omitted)); *Acevedo Lopez v. Police Dep't of P.R.*, 81 F. Supp. 2d 293, 297 (D.P.R. 1999), *aff'd on other grounds*, 247 F.3d 26 (1st Cir. 2001) ("The significance of driving is simply not on par with those basic, essential human functions that are within the contemplation of the ADA . . . .").[47]  More important, however, is the First Circuit's agreement that driving may be subsumed within the major life activity of working:

---

*Suffolk County Police Dep't*, 158 F.3d 635, 643 (2d Cir. 1998), it appears to have recently made a U-turn, *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 281 F.3d 333, 345 (2d Cir. 2002) (recognizing that major life activity of caring for one's self encompasses driving).
220 F. Supp. 2d at 895 n.3.

[47] A number of circuit courts have also found that driving is not itself a major life activity.  *See, e.g., Capobianco v. City of New York*, 422 F.3d 47, 58 (2d Cir. 2005) (holding that driving is not a major life activity on its own, but could be considered in determining whether plaintiff was substantially limited in the major life activity of seeing); *Chenoweth v. Hillsborough County*, 250 F.3d 1328, 1329-30 (11th Cir.

> [Plaintiff] takes exception to the district court's telescoping under the rubric of working and learning other asserted major life activities, namely: . . . driving at night. Even if . . . th[is] is a distinct major life activity, we agree with the district court that [it] may be reasonably subsumed within the broader context of working and learning.

*Whitney v. Greenberg, Rosenblatt, Kull & Bitsoli, P.C.*, 258 F.3d 30, 33 n.4 (1st Cir. 2001). Without deciding whether driving alone could be considered a major life activity, this Court will consider the limitations on Mr. Harding's ability to drive as they relate to his capacity to work.

### 3. Substantial Limitation

The third step is to determine whether the Plaintiff's impairment "substantially limits" the life activities that are properly deemed major. *Bragdon*, 524 U.S. at 631. This is a particularly complex task where, as here, the impairment is highly individualized in its manifestations. *See* note 1, *supra*. As the Supreme Court has stated, "[a]n individualized assessment of the effect of an impairment is particularly necessary when the impairment is one whose symptoms vary widely from person to person." *Toyota*, 534 U.S. at 199. Fibromyalgia is just such an impairment.

In general, unsupported self-serving statements by the plaintiff regarding the severity of a disability are insufficient to preclude summary judgment in an ADA case. Here, however, Mr. Harding's personal assertions are corroborated by medical records and by Dr. Fitzgerald's testimony describing the physical limitations associated with his fibromyalgia, particularly with respect to sleeping and lifting. This Court concludes that the record provides sufficient support for a reasonable jury to find that Mr. Harding's fibromyalgia substantially limits at least his major life activities of sleeping and lifting.

---

2001); *Wyland v. Boddie-Noell Enter., Inc.*, No. 98-1163, 1998 WL 795173, at *3 n.1 (4th Cir. Nov. 17, 1998) (per curiam) (unpublished opinion); *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 643 (2d Cir. 1998).

Mr. Harding was diagnosed with fibromyalgia in 1995 by Dr. Ringel (a sleep specialist) and Dr. Bennett (Mr. Harding's family physician). In 2005, Dr. Fitzgerald (a rheumatologist) confirmed the diagnosis of fibromyalgia and made an additional diagnosis of osteoarthritis.[48] Dr. Fitzgerald assessed Mr. Harding's condition by reviewing his medical history, performing an examination, and conducting a number of tests. Based on her evaluation of Mr. Harding, Dr. Fitzgerald imposed the following permanent, physical restrictions: push/pull – not more than 21 minutes per hour; twist/bend – not more than 21 minutes per hour; stand/walk – not more than 21 minutes per hour; overhead work – not more than 9 minutes per hour; sit – not more than 21 minutes per hour; lift and carry less than 10 pounds – not more than 21 minutes per hour; lift and carry greater than 10 pounds – not more than 9 minutes per hour; and, climb – not more than 9 minutes per hour. The result of the physical restrictions is that Mr. Harding will never again work as an electrical superintendent.

The evidence regarding Mr. Harding's ability to sleep at the time of his termination suggests he would only sleep three to four hours each night, while spending five to six hours in bed. While in bed, Mr. Harding would awake with muscle cramps and have to walk around before falling back to sleep. Based on her evaluation, Dr. Fitzgerald determined that he has a significant sleep disorder. After review of a 1994 sleep survey published in *The Washington Post*, which found that only 8% of persons surveyed slept less than five hours on weeknights and 6% slept less than five hours on weekend nights, Dr. Fitzgerald concluded that Mr. Harding was significantly restricted in his ability to sleep compared to the average person.

---

[48] Although Dr. Fitzgerald's assessment of Mr. Harding's condition occurred nearly three years after his termination, she opined that his condition remained largely unchanged from 2002 to 2005.

When viewed in a light most favorable to Mr. Harding, the record evidence raises a genuine issue of material fact whether Mr. Harding is substantially limited in his ability to sleep.[49]  *See Head v. Glacier Nw. Inc.*, 413 F.3d 1053, 1060 (9th Cir. 2005) (genuine issue of material fact exists where plaintiff is only able to sleep five to six hours per night with the help of medication and some nights cannot get to sleep for hours or at all); *Schopmeyer v. Plainfield Juvenile Corr. Facility*, No. IP 00-1029-C H/F, 2002 WL 31255466, at *5 (S.D. Ind. Sep. 17, 2002) (unpublished opinion) (finding triable issue where plaintiff was "up two or three times a night"); *Bennett v. Unisys Corp.*, No. 2:99CV0446, 2000 WL 33126583, at *6 (E.D. Pa. Dec. 11, 2000) (unpublished opinion) (precluding summary judgment where plaintiff was sleeping four to five hours per night prior to treatment and, after treatment, slept up to six hours per night); *Reed v. Lepage Bakeries, Inc.*, No. 98-450-P-H, 2000 WL 761626, at *4 (D. Me. Feb. 29, 2000) (unpublished opinion) (denying summary judgment where plaintiff relied on her own testimony to support claim that her psychiatric impairments substantially limited her ability to sleep); *Presta v. Se. Pa. Transp. Auth.*, No. CIV.A 97CIV.2338, 1998 WL 310735, at *7 (E.D. Pa. June 11, 1998) (unpublished opinion) (precluding summary judgment where plaintiff slept between two and five hours per night and woke frequently with nightmares).

The evidence regarding Mr. Harding's ability to lift is Dr. Fitzgerald's permanent restriction, limiting him to ten pounds occasionally, and his own subjective assessment

---

[49] This Court is cognizant that the evidence offered by Mr. Harding in connection with his ability to sleep is contradicted in some respects by other evidence in the record.  *See* DRPSMF – Part II ¶ 68 (listing examples of contradictions).  However, the conflicting evidence only serves to show that, in the material present in the summary judgment record, there is a dispute with respect to an issue of material fact.

that he can sometimes lift fifty to seventy pounds.[50]  PSMF ¶¶ 76-77; DSMF ¶¶ 291, 308.
Dr. Fitzgerald testified that the ten pound limit was imposed to prevent stress on Mr.
Harding's spine.  *Dep. of Lisa Fitzgerald* at 20 (Docket # 30); PSMF ¶ 76.  Mr. Harding
contends that the permanent restriction on his ability to lift is sufficient to thwart
summary judgment.

The First Circuit has concluded that an inability to lift heavy objects, without
more, does not amount to a substantial limitation on the major life activity of lifting.
*Gillen*, 283 F.3d at 22-23.  Along the same lines, a number of circuit courts have held that
a lifting restriction of twenty-five pounds does not render a person disabled within the
meaning of the ADA.  *See Snow v. Ridgeview Med. Ctr.*, 128 F.3d 1201, 1207 (8th Cir.
1997); *Thompson v. Holy Family Hosp.*, 121 F.3d 537, 539-40 (9th Cir. 1997); *Williams
v. Channel Master Satellite Sys.*, 101 F.3d 346, 349 (4th Cir. 1996) (per curiam); *see also
Mellon v. Fed. Express Corp.*, 239 F.3d 954, 957 (8th Cir. 2001) (concluding that a
plaintiff's disability claim based on the premise that "she cannot lift more than 15 pounds
and should avoid other such stresses with her right arm" was insufficient as a matter of
law to constitute a qualifying disability under the ADA); *Helfter v. United Parcel Serv.,
Inc.*, 115 F.3d 613, 617 (8th Cir. 1997) (finding that a substantial limitation on lifting was
not implicated where the plaintiff could not "perform sustained, highly-repetitive
activities with either hand, or lift more than ten pounds frequently and twenty pounds
occasionally").

---

[50]  The First Circuit has directed that a plaintiff's subjective self-assessment of his own capabilities
"deserves little weight."  *Gillen*, 283 F.3d at 22 (noting that appellant "did not dwell on the restrictions on
lifting that she had to overcome in order to achieve her objectives – and those restrictions comprise the
focal point of this prong of the ADA inquiry").  This Court will focus on the lifting restriction imposed by
Dr. Fitzgerald.

Mr. Harding, however, is not limited in his ability to lift only heavy objects; rather, he is restricted to lifting ten pounds for no more than twenty-one minutes per hour. Where a plaintiff is limited to occasionally lifting insignificant amounts of weight, numerous courts have found a genuine issue of material fact with respect to whether he is substantially limited in the major life of activity of lifting. *See, e.g., Lowe v. Angelo's Italian Foods, Inc.*, 87 F.3d 1170, 1174 (10th Cir. 1996) (finding genuine issue of material fact with respect to plaintiff's ability to lift where "she is unable to lift items weighing more than fifteen pounds [and should] lift items weighing less than fifteen pounds only occasionally"); *Ciszewski v. Engineered Polymers Corp.*, 179 F. Supp. 2d 1072, 1086 (D. Minn. 2001) (plaintiff with ten pound lifting restriction, tendonitis, shoulder pain, and chronic back pain generated triable issue with respect to lifting disability); *Simonetti v. Runyon*, No. CIV.A. 98-2128, 1999 WL 47144, at *4-5 (D.N.J. Jan. 29, 1999) (unpublished opinion) (triable issue regarding lifting where plaintiff was limited to reaching no more than two hours, lifting no more than ten pounds, "casing" no more than four hours, and bending, stooping, or twisting of the spine no more than one to two hours); *Miller v. Cohen*, 52 F. Supp. 2d 389, 398 (M.D. Pa. 1998) ("While a twenty-five pound lifting restriction may fall on the side of the commonplace, the ten-pound lifting restriction to which Plaintiff is subject may be characterized as severe when compared to the lifting abilities of the general population.") *Martin v. Lockheed Martin Missiles & Space*, No. C96-4620 FMS, 1998 WL 303089, at *5-6 (N.D. Cal. Apr. 1, 1998) (unpublished opinion) (finding genuine question of material fact where plaintiff had a ten-pound lifting restriction); *Testerman v. Chrysler Corp.*, No. CIV.A. 95-240 MMS, 1997 WL 820934, at *11 (D. Del. Dec. 30, 1997) (unpublished opinion) ("A

review of . . . cases reveals that the ambiguity in finding a disability . . . generally begins with lifting restrictions between 15 and 25 pounds."); *Wheaton v. Ogden Newspapers, Inc.*, 66 F. Supp. 2d 1053, 1061-62 (N.D. Iowa 1999) (genuine issue of material fact generated where plaintiff was unable to lift objects weighing more than ten pounds); *Haysman v. Food Lion, Inc.*, 893 F. Supp. 1092, 1100 (S.D. Ga. 1995) (same, where plaintiff could lift no more than ten to fifteen pounds).

The medical records and testimony distinguish this case from others which determined that a plaintiff's fibromyalgia did not substantially limit a major life activity. *See, e.g., Mincey v. Dow Chem. Co.*, 217 F. Supp. 2d 737, 742 (M.D. La. 2002) (fibromyalgia did not substantially limit major life activity where physician indicated no limitations); *Kaley v. Icon Int'l, Inc.*, No. IP99-1750-CH/K, 2001 WL 1781898, at *6-7 (S.D. Ind. Dec. 4, 2001) (unpublished opinion) (claim that fibromyalgia substantially limited major life activity not sufficient to create jury question without corroborative medical records); *Winn v. Runyon*, No. 96-C-3168, 1998 WL 565231, at *6 (N.D. Ill. Aug. 31, 1998) (unpublished opinion) (fibromyalgia did not substantially limit the major life activity of working where no consulting physicians indicated that plaintiff had a long-term restriction from certain types of work).   In those cases, the record generally contained no more than plaintiffs' own assertions regarding the limitations imposed by fibromyalgia.   Without medical records to support the claimed limitations, summary judgment for the defendants was appropriate.   By contrast, where a plaintiff with fibromyalgia provided some medical support for the claimed disability, courts have denied motions to dismiss and motions for summary judgment.   *See, e.g., Labrecque v. Sodexho USA, Inc.*, 287 F. Supp. 2d 100, 108-10 (D. Mass. 2003) (denying motion for

summary judgment where physician imposed physical limitations on plaintiff due to fibromyalgia); *Alifano v. Merck & Co., Inc.*, 175 F. Supp. 2d 792, 797 (E.D. Pa. 2001) (denying motion to dismiss where physicians sent letters to defendants explaining that plaintiff was afflicted with fibromyalgia and chronic fatigue syndrome, and that her resulting disability consisted of more than work-related restrictions); *Holt v. Olmsted Township Bd. of Trustees*, 43 F. Supp. 2d 812, 822 (N.D. Ohio 1998) (denying motion for summary judgment where the record contained evidence that plaintiff had seen a number of physicians for her fibromyalgia and was taking medication for the condition).

Because a reasonable jury could conclude that Mr. Harding's difficulty sleeping and lifting due to his fibromyalgia amounts to a disability within the meaning of the ADA and Rehabilitation Act, this Court need not address the possibility that other major life activities, *i.e.*, walking, sitting and standing, bending, performing manual tasks, and working, might be substantially limited as well. Mr. Harding has satisfied his burden in presenting a jury question regarding whether he has a disability within the meaning of the Acts.[51]

### B. Steps Two and Three: "Qualified Individual" and Discharge Due to Disability

The next inquiry is whether Mr. Harding was a "qualified individual" at the time of his termination. To be a "qualified individual" under the ADA and Rehabilitation Act, "a plaintiff must show first that [he] possesses the requisite skill, experience, education and other job-related requirements for the position and, second, that [he] is able to perform the essential functions of the position with or without a reasonable

---

[51] Because this Court concludes that Mr. Harding has generated a genuine issue of material fact with respect to whether he has a disability as that term is defined by 42 U.S.C. § 12102(2)(A), it does not address his alternative claim that Cianbro "regarded" him as disabled under 42 U.S.C. § 12102(2)(C).

accommodation." *Calero-Cerezo*, 355 F.3d at 22 (citing *Garcia-Ayala*, 212 F.3d at 646). An "essential function" is a fundamental task associated with a particular position, which can extend beyond "an employee's technical skills and experience, even including such individual or idiosyncratic characteristics as scheduling flexibility." *Laurin v. Providence Hosp.*, 150 F.3d 52, 59 n.6 (1st Cir. 1998) (citations omitted).

In this case, the evidence shows that Mr. Harding was an experienced electrician. He worked for Cianbro for eighteen and one-half years and held the position of electrical superintendent for approximately fourteen years prior to termination. This Court easily concludes that Mr. Harding possessed the requisite skill, experience, education, and other job-related requirements for the position of electrical superintendent.

There is also no question that a reasonable factfinder could conclude that Mr. Harding, while suffering the effects of fibromyalgia, osteoarthritis, and back pain, still possessed the ability to function competently without any modification of his work situation or with a reasonable accommodation. Indeed, upon termination of his employment at Cianbro, Mr. Harding secured a position at S&L Construction performing substantially the same type of work he had performed at Cianbro. He continued to work at S&L Construction until it ceased doing business in February of 2003.

The third and final element of Mr. Harding's prima facie case requires that he was fired because of his disability, or that his disability was a motivating factor in Cianbro's decision to fire him. *Katz v. City Metal Co., Inc.* 87 F.3d 26, 33 (1st Cir. 1996) (citing *Pedigo v. P.A.M. Transport, Inc.*, 60 F.3d 1300, 1301 (8th Cir. 1995)). The timing of Mr. Harding's termination, four to five weeks after disclosure of his condition, is circumstantial evidence of discrimination and satisfies the third prong of his prima facie

case. *Id.* (finding third element satisfied where plaintiff was fired one month after a heart attack).

### C.  Legitimate Non-Discriminatory Reason for Discharge

Since Mr. Harding has made out a prima facie case under the ADA and Rehabilitation Act, an inference of intentional discrimination is raised and the burden of production shifts to Cianbro to articulate a legitimate, non-discriminatory reason for its employment decision. *Ingram*, 414 F.3d at 230; *McDonnell Douglas Corp.*, 411 U.S. at 802. Mr. Harding concedes that Cianbro has satisfied its burden. *See Pl.'s Opp. to Def.'s Mot. for Summ. Judg.* at 5 (Docket # 47) (Mr. Harding "concedes that Cianbro has advanced a legitimate non-discriminatory reason for his discharge"); *see also McMillan v. Mass. Soc'y for the Prevention of Cruelty to Animals*, 140 F.3d 288, 300 (1st Cir. 1998) (employer's testimony that it terminated the plaintiff due to her poor work performance and acrimonious relationship with her co-workers was sufficient to shift the burden to the plaintiff to show that these reasons were a pretext for retaliation).

### D.  Pretext

Once Cianbro satisfied its burden, the "inference raised by [Mr. Harding's] prima facie case dissolves." *Dichner v. Liberty Travel*, 141 F.3d 24, 30 (1st Cir. 1998) (citing *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 823 (1st Cir. 1991)). Mr. Harding must now "show, unaided by the original inference of discrimination, that [Cianbro's] proffered reason is a pretext for discrimination," the real reason for his termination being based on impermissible animus directed toward him because of his fibromyalgia. *Id.* (citing *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 578 (1978), *and McDonnell Douglas*, 411 U.S. at 805). The First Circuit has explained that it is "insufficient for a plaintiff merely

to undermine the veracity of the employer's proffered justification; instead, [he] must muster proof that enables a factfinder rationally to conclude that the stated reason behind the adverse employment decision is not only a sham, but a sham intended to cover up the proscribed type of discrimination." *Id.* In *Dichner*, the First Circuit described this burden as "pretext plus." *Id.*

As the First Circuit stated in *Fite v. Digital Equip. Corp.*, 232 F.3d 3, 7 (1st Cir. 2000), the United States Supreme Court in *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) clarified that "'the falsity of the employer's explanation' may permit the jury to infer a discriminatory motive but does not compel such a finding." But, *Fite* also pointed out that "whether in a particular case a prima facie showing of discrimination and the disbelieved pretextual explanation make a stronger or weaker case for the plaintiff *depends very heavily on the facts*." *Fite*, 232 F.3d at 7 (emphasis supplied); *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 57 (1st Cir. 1999) ("[E]verything depends on the individual facts." (quoting *Woods v. Friction Materials, Inc.*, 30 F.3d 255, 260 n.3 (1st Cir. 1994), *abrogated on other grounds by Reeves*, 530 U.S. at 133)). Of course, at the summary judgment stage, all the plaintiff must do is produce evidence "'to create a genuine issue of fact with respect to two points: whether the employer's articulated reason for its adverse action was a pretext and whether the real reason was [disability] discrimination.'" *Quinones v. Buick*, 436 F.3d 284, 290 (1st Cir. 2006) (quoting *Thomas*, 183 F.3d at 62). The First Circuit's repeated emphasis that the third stage determination is fact based combined with the obligation to view the facts in a light most favorable to the nonmoving party reinforces why this Court must be cautious in granting summary judgment. *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 167

(1st Cir. 1998).   This caution is compounded by the recognition that it is rare an employee can point to direct evidence of improper employer motivation.  *Thomas*, 183 F.3d at 58 n.12 ("'[S]moking gun' evidence is 'rarely found in today's sophisticated employment world.'" (quoting *Hodgens*, 144 F.3d at 171 n.8)).

Mr. Harding makes three points to support his contention that he has raised a jury issue on pretext:  (1) the timing of his discharge; (2) the need for Cianbro to complete the demanding Amethyst Project and the concomitant increased physical demands on Mr. Harding; and, (3) the testimony of Mr. Schein, who as a former manager for Cianbro, testified that Mr. Harding's discharge was contrary to Cianbro policy and practice.  *Pl.'s Opp. to Def.'s Mot. for Summ. Judg.* at 26-30 (Docket # 47).

Mr. Harding points out that, after 18 years of successful employment, Cianbro fired him only 4-5 weeks after he revealed his fibromyalgia.  *Id.* at 27.  In *Katz*, the First Circuit stated that "[t]he timing of Katz's firing, one month after his heart attack, was circumstantial evidence from which the jury could find that Katz's disability triggered, in whole or in part, his firing by City Metal."  87 F.3d at 33; *see also Soileau*, 928 F. Supp. at 53 ("Soileau was fired soon after he requested an accommodation and thus the Court can infer, at this point, that Soileau's termination resulted from his request for a reasonable accommodation.").   As a practical matter, the longer the period of employment and the shorter the period between notice to the employer of the disability and the adverse employment action, the more powerful the inference.  Here, Mr. Harding had been employed for 18 years with Cianbro and after nearly two decades, Cianbro terminated him within four to five weeks of learning of his disability.

Beyond the circumstantial evidence of the timing, Mr. Harding has adduced further evidence through Peter Schein.  Mr. Schein, the long time Cianbro electrical manager, testified that Cianbro rarely, if ever, discharges an employee for interpersonal difficulties, that Cianbro prefers progressive discipline, that other employees had "soft skills" and were not terminated, and that Mr. Harding's behavior would not support a discharge according to Cianbro's established practice.  *See* PSMF ¶¶ 237-38, 240-46. The combination of evidence here, the timing of the discharge and the testimony of a former manager, generate circumstantial evidence that Cianbro's "articulated reason is false and discrimination was the actual reason for the employment action."  *Woods*, 30 F.3d at 260; *Lawrence v. Northrop Corp.*, 980 F.2d 66, 69 (1st Cir. 1992) ("It is not enough for [a] plaintiff merely to cast doubt upon the employer's justification.").  The law allows an employee "to prove discrimination by circumstantial evidence." *Thomas*, 183 F.3d at 58.

This is not to say that Cianbro has failed to present evidence a jury could well find compelling, contradicting Mr. Harding's assertions, potentially undercutting Mr. Schein's credibility, and demonstrating that the real reason for Mr. Harding's discharge was the cumulative impact of his persistent insubordination and his volatile and occasionally nasty relationship with his co-workers dating back to the mid-1990s.  A jury could well conclude that Cianbro's explanation for its employment action was based on reasons wholly unrelated to Mr. Harding's disability.  But, it could also conclude otherwise and, as such, Mr. Harding has generated questions of material fact appropriate for jury resolution.  *Hodgens*, 144 F.3d at 167 ("The role of the trial judge at the summary judgment stage 'is not . . . to weigh the evidence and determine the truth of the

matter, but to determine whether there is a genuine issue for trial." (quoting *Anderson*, 477 U.S. at 249)).

## III.  CONCLUSION

This Court DENIES Defendant's Motion for Summary Judgment (Docket # 18) on counts I and III of the First Amended Complaint.  Based on Plaintiff's acquiescence, this Court GRANTS Defendant's Motion for Summary Judgment on counts II, IV, and VI of the First Amended Complaint.

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE


Dated this 5th day of June, 2006