UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| RONALD HARDING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV-04-158-B-W |
| | ) | |
| CIANBRO CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON PLAINTIFF'S MOTION FOR EQUITABLE RELIEF**

Following a jury verdict in favor of Ronald Harding against Cianbro Corporation on a claim of disability discrimination, the Court orders Cianbro to reinstate Mr. Harding to his former position, but declines to order front pay to Mr. Harding. The Court grants Mr. Harding's motion for prejudgment interest on the compensatory damages portion of the jury verdict, but denies his claim for prejudgment interest on the punitive damages portion of the award. Mr. Harding withdraws his claim for a civil penalty under Maine statutory law.

**I. STATEMENT OF FACTS**

On September 9, 2002, Ronald Harding, a Cianbro employee with eighteen years seniority, was summoned to his supervisor's office and fired. His termination is now a federal case. Two years to the day later, Mr. Harding filed suit against Cianbro, alleging that by terminating him, Cianbro violated the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*, (ADA), the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq.*, (Rehabilitation Act), and the Maine Human Rights Act, 5 M.R.S.A. §§ 4551 *et seq.* (MHRA). *Compl.* (Docket # 1). On August 22, 2006, after a six-day trial, a jury issued a special verdict, finding that Cianbro had terminated Mr. Harding because of his disability and awarding him $137,000.00 in non-

economic damages, $563,000.00 in back pay damages, and $50,000.00 in punitive damages. *Jury Verdict* (Docket # 149). In accordance with the law in this circuit, the "decision to award or withhold front pay is . . . within the equitable discretion of the trial court." *Lussier v. Runyon*, 50 F.3d 1103, 1108 (1st Cir. 1995) (concerning Title VII and Rehabilitation Act). The parties initially submitted four questions to the Court: (1) whether Mr. Harding is entitled to reinstatement; (2) whether he is entitled to front pay and, if so, how much; (3) whether he is entitled to prejudgment interest on the award of punitive damages; and, (4) whether he is entitled to a statutory civil penalty under 5 M.R.S.A. § 4613(2)(B)(7). *Pl.'s Mot. for Equitable Relief* (*Pl.'s Mot.*) (Docket # 171); *Def.'s Resp. to Pl.'s Mot.* (*Def.'s Resp.*) (Docket # 173). The first two questions are "closely intertwined." *Braverman v. Penobscot Shoe Co.*, 859 F. Supp. 596, 606 (D. Me. 1994).

## II. DISCUSSION

### A. The Evidence

Born in 1947 in Oakland, Maine, Ronald Harding is a licensed master electrician. After he was graduated from Waterville High School in 1965, Mr. Harding worked initially for Waterville Hardware in the electrical department, where he came to know Peter Schein, a man who became his mentor. *Tr.*[1] 61:20, 22-25; 62:1, 17-25; 63:8-10; 547:15-18. In the mid-sixties, Mr. Schein, an electrical field supervisor, hired Mr. Harding to work for Northern Electric, an electrical contractor, *Tr.* 547:24-25; 548:1-5, and in February 1984, Mr. Schein, then working for Cianbro, hired Mr. Harding to work for Cianbro as an electrical foreman, building three hydroelectric plants in Port Lyden, New York. *Tr.* 63:6-14; 548:3-10. After working for about four years as an electrical foreman, Cianbro promoted Mr. Harding to general foreman, and about a year to a year and one-half later, Cianbro promoted him again to electrical

---

[1] The transcript of the jury trial proceedings is located in docket numbers 178-183.

superintendent, a job he held until his termination. *Tr.* 63:21-25; 64:1-7. Mr. Harding remained employed at Cianbro from February 1984 to September 9, 2002, when he was fired, a period of just over eighteen and one-half years. *Tr.* 64:5-7.

Cianbro is a heavy industrial contractor headquartered in Pittsfield, Maine. *Tr.* 64:13-15. With a geographic range from northern Maine to Virginia, Cianbro builds significant industrial projects, including bridges, power plants, and paper mills. *Tr.* 64:16-17. During his eighteen and one-half years, Mr. Harding worked in Maine, New Hampshire, Vermont, New York, Connecticut, Delaware, New Jersey, and Maryland. *Tr.* 65:11-14. As an electrical superintendent, Mr. Harding supervised a crew, worked with engineers to straighten out engineering problems, handled materials, and oversaw safety issues. *Tr.* 64:18-25. As of September, 2002, his weekly salary was $1,350.00. *Tr.* 65:5-7.

### 1. Ron Harding and Cianbro: A Question of Attitude

There is a sharp division of opinion at Cianbro about Ron Harding. No one questions his competence; he is by all accounts an extremely capable electrician. *Tr.* 549:22-25; 550:1-8; 819:25; 820:1-2. Rather, the division centered on Mr. Harding's personality, his willingness to be a team player, and his general attitude. Within Cianbro, Mr. Harding's strongest advocate was Peter Schein. Before his retirement in April 2001, Peter Schein had risen to Electrical Area Manager, an important position within Cianbro, covering the entire northern New England region. *Tr.* 545:20-25; 546:1-12. Mr. Schein testified that he received "positive" feedback when he assigned Mr. Harding to a job. *Tr.* 550:19-21. Over the years, Mr. Schein received complaints about Mr. Harding, but the number was "similar" to other Cianbro employees under

his supervision. *Tr.* 552:23-25; 553:1-3.  Mr. Schein acknowledged he had received complaints about Mr. Harding from Frank Susi,[2] Scott Clements,[3] Nick Bell,[4] and Parker Hadlock.[5]

Others, especially two project managers, Parker Hadlock and Nick Bell, were extremely critical of Mr. Harding.  Mr. Hadlock characterized Mr. Harding as "not collaborative," said he "didn't communicate well" and had a "negative outlook."  *Tr.* 991:21; 997:22.  Mr. Bell described Mr. Harding as having a "negative approach," and as being "critical, rather than being helpful."  *Tr.* 838:23-25.  Martin Roach, a Cianbro Electrical General Foreman, testified that "everybody was uncomfortable working around him" and he was "just miserable" and "mad at the world."  *Tr.* 788:19-20; 796:6-10.

### 2.  Ronald Harding and Fibromyalgia

Ronald Harding has been diagnosed with a medical condition called fibromyalgia.[6]  Dr. Lisa Fitzgerald, a rheumatologist, described fibromyalgia as a syndrome that "encompasses a lot of symptoms," which "together make up a picture of pain in tendons, muscles, and joints."  *Tr.* 123:1-6.  The medical records reflect that Mr. Harding began to experience symptoms consistent with fibromyalgia in the mid-1970s to early 1980s.  *Pl.'s* Ex. 4.  The first medical reference to fibromyalgia as a diagnosis appears in an office note from Dr. Ringel on  December 11, 1995.  *Pl.'s* Ex. 3.  Mr. Harding sought help from Dr. Thomas Chasse, a chiropractor, and he maintained regular treatments.  *Id*.

---

[2] When Mr. Harding was terminated, Mr. Susi was Cianbro's Vice President/General Manager for northern New England; he is currently Vice President for Engineering.  *Tr.* 740:14-23.
[3] Mr. Clements was the project manager on the Veazie Project.  *Tr.* 570:23.
[4] Roland "Nick" Bell is a central figure in this dispute.  He and Mr. Harding had known each other since 1971, long before their employment with Cianbro.  *Tr.* 819:10-11.  Mr. Bell is a project manager for Cianbro and supervised Mr. Harding on a project in Montville, Connecticut in 1994, the Phoenix project in Jay in 1996, and the Amethyst project beginning 2000-01.  *Tr.* 819:3-24.
[5] Mr. Hadlock was project manager on the Casco Bay Bridge Project in Portland.  *Tr.* 550:22-25; 551:1-9.
[6] The Court is aware that fibromyalgia generates some controversy in the medical field.  *See Trask v. Auto. Ins. Co.*, No. CV-94-379 (Me. Super. Ct., Pen. Cty., Apr. 7, 1997) (Mead, J.).  Dr. Fitzgerald was the sole medical expert at trial and the Court's recitation summarizes her testimony.

Dr. Fitzgerald performed an extensive evaluation of Mr. Harding on March 25, 2005. *Tr.* 127:10-12; *Pl.'s* Ex. 4. The doctor took a history from Mr. Harding that revealed that he had been experiencing pain for "many, many years," which had grown worse, particularly during the winter of 2004-2005. *Tr.* 130:17-23. His symptoms included back stiffness, both in his mid and lower back, with radiation of pain down his legs into his thigh, arm pain, thumb pain, and increased discomfort with prolonged activity, ranging from sitting to standing. *Tr.* 130:24-25; 131:1-11. Due to the thumb pain, he experienced difficulty grasping things and would "often drop things." *Tr.* 131:23-25. The thumb pain was "a cramping, knife-like" pain, which went "right through the base of the thumb." *Tr.* 131:12-17. Mr. Harding was also experiencing difficulties with sleep. *Tr.* 132:1-21. He was able to sleep for a "couple of hours," but would awaken "fairly stiff and sore." *Tr.* 132:5-6. He would sleep anywhere from two to four hours total a night and would "never feel rested." *Tr.* 132:16-21. Mr. Harding reported difficulty working overhead and walking on harder surfaces. *Tr.* 133:12-17.

Although Dr. Fitzgerald described Mr. Harding as "quite stoic," she observed on physical examination that he was "kind of stiff," that his "gait was off" and he was "limping a bit." *Tr.* 134:21-25. She also found "a lot of tender points," a finding consistent with fibromyalgia. *Tr.* 136:7-23. Dr. Fitzgerald ordered a series of tests, including blood work and x-rays. *Tr.* 137. Based on the history, examination, and diagnostic tests, Dr. Fitzgerald concluded that Mr. Harding had "significant fibromyalgia, and . . . significant osteoarthritis in his thumbs." *Tr.* 138:25; 139:1-4. She recommended that he continue with minor pain relievers, such as Aleve or Advil. *Tr.* 138:10-12. She prescribed a tricyclic medication to assist with sleep. *Tr.* 138:13-17. She recommended that he remain "as active as he could within limits." *Tr.* 139:8-14.

Dr. Fitzgerald completed a physician's form that imposed restrictions on Mr. Harding's activities. She did not restrict him from work entirely, but imposed significant physical limitations. *Tr.* 140:19-21; *Pl.'s* Ex. 5. She noted that he was not able to sit for periods of more than 30 minutes because of difficulty with stiffness. *Id.* She said that he could perform the following on an occasional basis – meaning 21 minutes per hour: push/pull, twist/bend, use his right and left arm, stand/walk, sit (a limit of ten minutes), lift and carry (a limit of ten pounds). *Id.* She imposed more intense restrictions on certain activities, noting that he could engage in these activities only on a minimal basis – meaning 9 minutes per hour: use of right or left hand, kneel/crawl, stoop, work overhead, climb, and use of vibratory tools. *Id.* Mr. Harding also had increased symptoms with cold weather. *Tr.* 143:9-19.

Dr. Fitzgerald re-examined Mr. Harding on July 17, 2006, approximately a month before trial. *Tr.* 144:16-25; 145:1-3; *Pl.'s* Ex. 6. Mr. Harding had continued to see a chiropractor, which alleviated his symptoms temporarily. *Tr.* 146:10-13. His thumbs were worse; he was experiencing swelling in the base of his thumbs and his hands were falling asleep at night. *Tr.* 146:14-23. He had the same back and spine stiffness. *Tr.* 146:24-25. Dr. Fitzgerald maintained the same diagnoses, but added a third one: probable carpal tunnel symptoms. *Tr.* 150:23-25.

Dr. Fitzgerald expressed the view that the restrictions from these conditions were likely "indefinite" and unlikely to change. *Tr.* 151:9-22. She was more specific about the hand restrictions, explaining that Mr. Harding could not "hold a pen or pencil for a long time . . . couldn't hold a tool for a long time that required planting it in the base of his palm. He might need to have some kind of a - - a special handle on a tool, like a screwdriver or pliers or hammer." *Tr.* 153:4-9. She said he was "definitely able to do light work." *Tr.* 157:23-25.

Despite these permanent restrictions, Dr. Fitzgerald testified that she thought that if he had not been terminated, he would have been able to continue his work at Cianbro as an electrical superintendent. *Tr.* 154:12-18. She opined, however, that he would not have been able to work as an electrician. *Tr.* 154:22-25; 155:1-14. When she saw Mr. Harding in July 2006, he told her he was working part-time – two or three days a week and typically not two days in a row. *Tr.* 156:3-12. She thought his current job, as described, "seemed to suit him okay." *Tr.* 156:16. He was "able to come and go as he wanted. He sometimes worked a four-hour day; he sometimes worked a little longer. But the intermittent nature of it was what was the important part, was what made him able to do it and be able to continue it." *Tr.* 156:6-12. She stated that the reason the current job suited him "was because of the fact that he could stretch, rest, not do a full day or the eight- or ten- or twelve-hour day, day in and day out." *Tr.* 156:16-19.

### 3. Cianbro and Fibromyalgia

In 2002, Cianbro began what was called the Amethyst Project, *Tr.* 101:22-23, the biggest project Cianbro had ever undertaken. *Tr.* 709:18-20. Cianbro completed two off-shore drilling platforms in Portland Harbor, an enormous job of unusual complexity, requiring a high degree of precision and coordination. *Tr.* 297:2-11, 20-25; 298:1-9. The chain of command for the Amethyst Project began at the top with Dave Leavitt, the Project Manager; below Mr. Leavitt was Parker Hadlock, the Construction Manager; Nick Bell was the Electrical Manager and he also reported directly to Mr. Leavitt. *Tr.* 298:15-18. Ron Harding reported directly to Nick Bell. *Tr.* 837:22-23. Nick Bell did not like Ron Harding; they had a history of difficulty extending back "for years."[7] *Tr.* 599:3-10.

---

[7] During trial, the parties fenced on the exact history of the difficult relationship between Mr. Harding and Mr. Bell, when it began, what caused it, and who was responsible; it is unnecessary, for purposes of the issue before the Court, to recite the specifics.

7

In early August, 2002, Mr. Harding informed Cianbro that he had fibromyalgia. *Tr.* 420:4-25; 421:1-16. Bill Marquis, the safety supervisor for the Amethyst Project, noticed that Mr. Harding was "moving very slow" and he asked him whether he had hurt himself on the job. *Tr.* 420:4-6. Mr. Harding disclosed his fibromyalgia. *Tr.* 420:6-10. A few days later, Nick Bell elicited the same information from Mr. Harding. *Tr.* 424:19-25; 425:1-12. Approximately five weeks later, Mr. Bell notified Mr. Harding that Cianbro was terminating his employment. *Tr.* at 857:23-25; 858:1-15; 859:1-13.

### 4. The Stipulation

During trial, the parties stipulated that when Cianbro terminated him, Mr. Harding "had a disability" and that "he was a qualified individual; in other words, that he could have performed the essential functions of his position as an electrical superintendent with or without reasonable accommodation."[8] *Tr.* 115:11-25; 116:1-8.

### 5. The Jury Verdict

By returning its special verdict, the jury found that Cianbro terminated Mr. Harding because of his disability. *Jury Verdict*. The jury awarded $137,000.00 in non-economic damages. *Id.* During his closing argument, Mr. Young, Mr. Harding's attorney, suggested that the economist's evidence justified an award for lost back pay in the total amount of $563,897.00, *Tr.* 1183:15-17; the jury awarded $563,000.00. *Jury Verdict*.

The Court instructed the jury that to obtain punitive damages, "Mr. Harding must prove by a preponderance of the evidence that in terminating his employment, Cianbro either knew that

---

[8] To place this stipulation in context, the Court preliminarily instructed the jury that the Plaintiff had the burden of proof on four elements: (1) that he had a disability; (2) that when Cianbro discharged him, he was a qualified individual, meaning that he could have performed the essential functions of his position as an electrical superintendent with or without reasonable accommodation; (3) that Cianbro knew Mr. Harding had a disability; and, (4) that were it not for Mr. Harding's disability, Cianbro would not have terminated him. *Tr.* 29:21-25; 30:1-3. Based on the stipulation, the Court instructed the jury that the first two elements had been "satisfied by the stipulation" and Mr. Harding retained the burden of proof on the last two elements. *Tr.* 115:18-25; 116:1-4.

8

its actions violated federal or Maine law or acted with reckless or callous indifference to that risk." *Tr.* 1160:15-19.  The Court reminded the jury that if Mr. Harding satisfied this requirement, it was "entirely up to [them] whether or not to award punitive damages, but it should be presumed that Mr. Harding has been made whole by compensatory damages." *Tr.* 1160:20-23.  Further, the jury was instructed that it should award punitive damages "only if Cianbro's culpability is so reprehensible as to warrant further sanctions to achieve punishment or deterrence.  If [they] decide to award punitive damages, the amount to be awarded is within [their] sound discretion.  The purpose of a punitive damages award is to punish a defendant or deter a defendant and others from similar conduct in the future." *Tr.* 1160:23-25; 1161:1-4.  The jury awarded Mr. Harding $50,000.00 in punitive damages.  *Jury Verdict*.

### B. Whether Mr. Harding is Entitled to Reinstatement or Front Pay

In *Albemarle Paper Co. v. Moody*, the Supreme Court explained that the goals of employment discrimination laws include "eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination."[9]  422 U.S. 405, 421 (1975); *Lussier v. Runyon*, 50 F.3d 1103, 1111 (1st Cir. 1995).  The Court accepts the jury determinations that Cianbro discriminated against Mr. Harding because of his disability, that he incurred an economic loss up to the date of the verdict of $563,000.00, that he sustained $137,000.00 in compensatory damages, and that he is entitled to $50,000.00 in punitive damages.  Under the Seventh Amendment, the judge is bound by the jury's decision on all issues common to the requests for legal and equitable relief.  *Music Suppliers v. London Records, Inc.*, No. 79-2566-G1, 1988 U.S. Dist. LEXIS 3475, at *8 (D. Mass. Feb. 22, 1988) ("Where legal and equitable issues intertwine . . . a trial judge should normally refrain from making an equitable

---

[9] Although *Albemarle* addressed discrimination under Title VII, its statement of goals appears equally applicable to the ADA, especially since the remedies under the ADA are established by reference to Title VII.  *See* 42 U.S.C. § 12117(a).

determination until the jury has decided the legal claims."); *see also Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 550 (1990).

The verdict, nevertheless, left unanswered whether Mr. Harding has remedies for future economic loss: reinstatement and front pay. Mr. Harding seeks both. *See Che v. Mass. Bay Transp. Auth.*, 342 F.3d 31, 37 (1st Cir. 2003) ("Che moved the district court for reinstatement to his job as chief inspector, or alternatively, for an award of front pay."); *Selgas v. Am. Airlines*, 104 F.3d 9, 12 (1st Cir. 1997) ("Kerr Selgas had requested reinstatement in her initial complaint, and also in subsequent motions . . . ."); *Velazquez v. Figueroa-Gomez*, 996 F.2d 425, 428 (1st Cir. 1993) ("The last issue . . . is whether the district court properly denied plaintiffs' request for reinstatement").

When an employee, who has been the victim of unlawful discrimination, seeks relief, the law favors reinstatement. The First Circuit has stated that awards of front pay "are generally entrusted to the district court's discretion and are available only where reinstatement is impracticable or impossible." *Rodriguez-Torres v. Caribbean Forms Mfr., Inc.*, 399 F.3d 52, 67 (1st Cir. 2005); *Johnson v. Spencer Press of Me., Inc.*, 364 F.3d 368, 380 (1st Cir. 2004). The First Circuit has made it clear that the "overarching preference" in employment discrimination cases is "for reinstatement." *Che*, 342 F.3d at 43. A district court's "discretion to fashion an equitable remedy must be consistent with the important national goals reflected in the statute." *Id.* These goals include "eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Id.* (quoting *Albemarle*, 422 U.S. at 421). In *Che*, the First Circuit reiterated that "reinstatement is an important remedy because it most efficiently advances the goals of Title VII by making plaintiffs whole while also deterring future discriminatory conduct by employers." *Id.* (citation and internal punctuation omitted). To

deny this "important remedy," there must be "equitable considerations different in kind or degree from those regularly accompanying reinstatement . . . ." *Rosario-Torres v. Hernandez-Colon*, 889 F.2d 314, 323 (1st Cir. 1989).  Finally, the First Circuit has cast a dim eye on co-worker hostility as a ground to deny reinstatement.  *See Che*, 342 F.3d at 43-44; *Quint v. A.E. Staley Mfg. Co.*, 172 F.3d 1, 20-21 (1st Cir. 1999); *Rosario-Torres*, 889 F.2d at 322.

There is authority that an employee is not entitled to front pay if he does not seek reinstatement. *Greene v. Union Mut. Life Ins. Co.*, 635 F. Supp. 1437, 1438 (D. Me. 1986) ("This Court is fully persuaded that 'front pay' damages, being allowable only as an alternative for reinstatement of the Plaintiff where that is impracticable or impossible, such damages cannot be awarded *where no claim is made in the litigation* for such reinstatement.") (emphasis in original); *see also Kolb v. Goldring, Inc.*, 694 F.2d 869, 875 n.4 (1st Cir. 1982); *Wehr v. Burroughs Corp.*, 619 F.2d 276, 283-84 (3d Cir. 1980); *Ramos v. Davis & Geck, Inc.*, 968 F. Supp. 765, 770 n.3 (D.P.R. 1997) (concerning Puerto Rican state statute), *aff'd*, 167 F.3d 727 (1st Cir. 1999).

Mr. Harding's legal position is nuanced.  Although he seeks reinstatement to his former position at Cianbro, Mr. Harding contends reinstatement is impracticable and he is, therefore, entitled to front pay.  *Pl.'s Mot.* at 2.  Cianbro responds that it has work available for Mr. Harding; it would assign him to southern New England, where he worked successfully before, and would have him report directly to Peter Vigue, the President of Cianbro.  *Def.'s Resp.* at 3-4.

Mr. Harding's underlying legal position – that he is capable of performing work for Cianbro as an engineering superintendent – is fully consistent with the evidence at trial:  (1) the parties stipulated that although he has a disability, he could have "performed the essential functions of his position as an electrical superintendent with or without accommodation." *Tr.*

115:18-23; (2) Dr. Fitzgerald expressed her professional opinion that he could perform the work of an electrical superintendent, *Tr.* 154:12-18; (3) Margaret Robinson, a vocational rehabilitation counselor, testified that he could work as an electrical superintendent, *Tr.* 220:9-19; (4) Mr. Harding testified that he never had any work restrictions at Cianbro, never asked for any, never needed any, would have been able to work overtime, and could still perform the electrical superintendent job at Cianbro.[10] *Tr.* 454:13-18; 458:17-25; 459:1-5. In effect, even though he acknowledges he could perform his old job, he argues he cannot do so due to employer hostility.

The First Circuit has carved out an exception to its preference for reinstatement: "a finding of extraordinary antagonism" can justify a district court's denial of reinstatement. *Che*, 342 F.3d at 44. In *Quint*, the First Circuit wrote: "We do not state that coworker hostility, adequately proven real and intolerable, may not provide an appropriate ground for refusing reinstatement." *Quint*, 172 F.3d at 21. However, in *Che*, the First Circuit disagreed with the district court's conclusion that the testimony of two witnesses at trial would generate co-worker hostility sufficient to justify denying reinstatement: "The participation of supervisors and coworkers in a plaintiff's employment discrimination case is common and often unavoidable. These attendant antagonisms are precisely the type of 'routinely incidental burdens' that are a foreseeable consequence of the defendants' misconduct, and therefore insufficient, without more, to tip the scales against reinstatement." *Che*, 342 F.3d at 43-44 (citation and internal punctuation omitted).

Here, the evidence does not justify the conclusion that reinstatement is "impracticable or impossible." *Wildman v. Lerner Stores Corp.*, 771 F.2d 605, 616 (1st Cir. 1985). The evidence

---

[10] When Mr. Harding was terminated, the Amethyst Project was about to ramp up and this would have required him to work a significant amount of overtime. On cross-examination, Mr. Harding was asked whether he had any doubt whether he would have been able to perform this job at the Amethyst Project, including the overtime, and he responded: "I had no doubt." *Tr.* 458:24-25; 459:1-5.

about reinstatement is sparse. Although the front pay issue was addressed during trial, the parties concentrated on the questions of liability and jury-assessed damages and there is a paucity of evidence regarding reinstatement.[11]

Nevertheless, on balance, the evidence strongly suggests that reinstatement is feasible. The size and breadth of Cianbro's operations make it more likely that Mr. Harding's return to work will be successful. Cianbro is a comparatively large corporation with gross annual revenue ranging from $255 million to $300 million and employs approximately 2,000 individuals. *Tr.* 742:16-25; 743:1-22; 659:24-25. It is organized into three regions: northern New England, southern New England, and mid-Atlantic; there is separate leadership for each region. *Tr.* 578:11-25. Recommendations about pay raises, for example, come from the applicable job site. *Tr.* 578:22-25; 579:1-2. Mr. Harding does not have a "home region." *Tr.* 578:16-18. During his tenure at Cianbro, Mr. Harding worked "from northern - - northern Maine to Virginia," including the states of "Maine, New Hampshire, Vermont, New York, Connecticut, Delaware, New Jersey, and a short term in Maryland." *Tr.* 65:8-14. During the trial, the supervisors who testified

---

[11] This is true, despite the understanding that, consistent with First Circuit precedent, the Court, not the jury, was going to decide the front pay issue. After the verdict, the parties filed memoranda and attached affidavits of counsel, referencing additional exhibits. It was unclear whether the parties objected to each other's affidavits and exhibits and whether Mr. Harding objected to Cianbro's counsel's written description of its reinstatement offer. *See Quint*, 172 F.3d at 20 ("Although Staley's brief below represented that coworker tensions existed, statements by counsel are not competent evidence."); *Lussier*, 50 F.3d at 1113 (vacating front-pay award and noting that "[i]t is a fundamental principle of our jurisprudence that a factfinder may not consider extra-record evidence concerning disputed adjudicative facts"). The Court held a telephone conference of counsel on January 3, 2007. Both parties agreed that the Court could consider the other's affidavit and exhibits. Also, Mr. Harding agreed that the Court could consider as evidence the following representations by Cianbro's counsel:

> Cianbro will not have Plaintiff work with the persons who testified at trial and will not have him report to the same supervisor who fired him. Rather, it will put him to work in Southern New England, where he successfully worked when he was previously employed by Cianbro and would have him report directly to Peter Vigue, Cianbro's President.

*Def.'s Resp.* at 3-4.

against him worked mostly in northern New England, thereby raising the likelihood any regional fallout would not be encountered elsewhere.

There are several other factors that bode well for Mr. Harding's reinstatement. First, the evidence confirms that Mr. Harding is an excellent electrical supervisor; even the Cianbro employees who were uncomplimentary about his personality praised his competence. Second, Mr. Harding is physically capable of performing the job of electrical superintendent. Third, Mr. Harding worked for Cianbro for eighteen and one-half years, the longevity of his service suggesting both his perseverance and talent. Fourth, Cianbro has undertaken the unusual accommodation of allowing Mr. Harding to report directly to Peter Vigue, the President of Cianbro, an accommodation which should substantially lessen the possibility of ongoing supervisor hostility.[12] *Def.'s Resp.* at 3-4.

Consistent with the jury verdict and the evidence, the Court acknowledges that Cianbro discriminated against Mr. Harding. The jury found its discrimination sufficiently egregious to warrant the imposition of punitive damages. Even so, there is no authority that the imposition of punitive damages in an employment discrimination case bars reinstatement. To the contrary, in *Quint*, the First Circuit remanded the case to the trial court for further consideration of reinstatement, despite a jury finding of punitive damages in the amount of $420,000.00. 172 F.3d at 18. Although Mr. Harding claims that the nature of management animosity exhibited at trial was unusual, the Court disagrees. Management testimony about Mr. Harding was, in the Court's view, wholly consistent with the "routinely incidental burdens" of litigation the First Circuit described in *Che*. 342 F.3d at 43-44.

The next issue is whether the prior level of management antagonism prevents reinstatement. After evaluating the evidence, the Court concludes that the level of management

---

[12] Presumably, no supervisor would wish to act inappropriately to an employee who has the ear of the President.

antagonism toward Mr. Harding simply does not reach the level of "extraordinary antagonism" *Che* requires. 342 F.3d at 44. Cianbro is a major construction company and its work taxes its employees' mental and physical limits. As Mr. Harding's counsel aptly stated during his closing argument, a "construction site is not a tea party." *Tr.* 1176:6-7. It is inevitable that employees will occasionally bump heads, leading to a frank and open exchange of differing views, perhaps in direct and undiplomatic language. Mr. Harding testified about a number of disagreements he had had over the years with various employees, including supervisors, but in his view, they had been able to patch up their differences and work together.[13] There is no reason to conclude that the management employees at Cianbro and Mr. Harding could not do in the future what they have done in the past.

Mr. Harding cites *Kelley v. Airborne Freight Corp.*, 140 F.3d 335 (1st Cir. 1998), to support his employer hostility argument. *Kelley*, however, was a markedly different case. First, at trial, the question of front pay was submitted to the jury under Massachusetts state law and the jury found that the employee was entitled to $1,000,000.00 in front pay. *Id.* at 345. Second, at trial, the employer expressly refused to offer reinstatement and made the offer only by post-trial motion. *Id.* at 352-53. Third, the employer suggested that the employee be assigned to a "specially created position" reporting to the person who was his supervisor before the termination. *Id.* at 353. Fourth, the trial judge held a two-day post-verdict hearing on

---

[13] The trial revealed numerous examples of disagreements that were later resolved. For example, Mr. Harding and Parker Hadlock, his supervisor on the Casco Bay Bridge Project, became "upset with one other" during the project. *Tr.* 269:15-17. But, Mr. Harding worked under Mr. Hadlock after the Casco Bay Bridge Project, and Mr. Hadlock not only gave Mr. Harding an excellent performance review, but also recommended him for a raise. *Tr.* 269:15-25; 270:1-25; 271:1-25; 272:1-25; 273:1-25; 274:1-25; 275:1-16. During the so-called Phoenix Project, Mr. Harding had an intense disagreement with Michael Ritchie, which ultimately resulted in physical shoving, but Mr. Harding apologized and he testified that he had no further problems with Mr. Ritchie. *Tr.* 99:13-17; 100:1-15, 25; 101:1. Mr. Harding and Mr. Bell also had a significant disagreement during the Phoenix Project. *Tr.* 95:10-25; 96:1-25; 97:1-25; 98:1-25; 99:1-12. Later, when Mr. Harding learned that Mr. Bell was harboring a grudge, he talked to Mr. Bell and they agreed "to let bygones be bygones, and we'll start from new." *Tr.* 102:8-25; 103:10-17. Mr. Harding and a co-employee, James Marquis, developed the habit of exchanging insults. Mr. Harding testified that after he learned he was upsetting Mr. Marquis, he went to him, apologized, and they had no further difficulty. *Tr.* 305:7-25; 306:1-25; 307:1-11.

reinstatement and concluded, based on the evidence, that reinstatement was "impracticable in the extreme." *Id.* He based his conclusion on his finding that the degree of antipathy the employer's management held for the employee went beyond the "animosity engendered by the litigation." *Id*. *Kelley* is not sufficiently similar to the evidence in this case to provide a convincing precedent for Mr. Harding's position.

The Supreme Court and the First Circuit have made clear that reinstatement is a remedy designed to discourage discrimination and to make the employee whole. In its Response, Cianbro has proposed to assign Mr. Harding to the southern New England region. Mr. Harding objects, noting that he lives in Waterville, Maine and to require him to work in southern New England would represent a hardship. Mr. Harding's protest, however, must be measured against his past history of job assignments at Cianbro, which reveals extensive work in southern New England and elsewhere. A routine assignment in the southern New England region would be generally consistent with his past employment history at Cianbro.

Nevertheless, a permanent assignment in southern New England to the exclusion of work within the entire northern New England region could improperly limit the range of projects for which he would be eligible and would otherwise work a hardship on Mr. Harding, who lives in Maine. This result would be inconsistent with the underlying remedial purpose of the Court's reinstatement order. The Court's reinstatement order contemplates that Mr. Harding will return to work in the same position he held before his termination, electrical superintendent, and that Cianbro will minimize any untoward impact on him resulting from its illegal discrimination. The Court fully anticipates that Mr. Harding and Cianbro Corporation will work cooperatively to obviate any problems that result from his reinstatement, but, if necessary, the Court will address any issues that may arise as a consequence of this Order.

### C. Whether Mr. Harding is Entitled to Prejudgment Interest on the Award of Punitive Damages[14]

The jury issued a punitive damages award in the amount of $50,000.00. Mr. Harding requests prejudgment interest on the award; Cianbro objects.[15] The general rule is that "[i]nterest is not allowable as an element of punitive damages." Restatement (Second) of Torts § 913 cmt. d (1979); *see also Right to Prejudgment Interest on Punitive or Multiple Damages Awards*, 9 A.L.R.5th 63 (1993). The rationale for denying prejudgment interest is expressed variously, but the main policy point seems to be that enough is enough. Since prejudgment interest is "an element of compensatory damages," *Webber v. Int'l Paper Co.*, 307 F. Supp. 2d 119, 129 (D. Me. 2004), an award of prejudgment interest on top of an assessment of punitive damages would have "the flavor of unseemly piling on." *City Coal Co. of Springfield v. Noonan*, 751 N.E.2d 894, 900 (Mass. 2001) (quoting *Makino, U.S.A., Inc. v. Metlife Capital Credit Corp.*, 518 N.E.2d 519, 529 (Mass. App. Ct. 1988)). As *Makino* expressed it, "compensatory damages are truly

---

[14] In his motion, Mr. Harding also demanded pre-judgment interest on the compensatory damages award of $137,000. *Pl.'s Mot.* at 11. Cianbro failed to respond. *Def.'s Resp.* at 11-12. In his Reply, Mr. Harding asserted that "Cianbro does not oppose Plaintiff's request for prejudgment interest on the compensatory damages award of $137,000." *Pl.'s Reply* at 14 (Docket # 175). During a telephonic hearing on January 3, 2007, Cianbro conceded that it had waived any objection to the assessment of prejudgment interest on the $137,000.00 in compensatory damages. Cianbro also failed to object to Mr. Harding's position that the applicable interest rate is the federal rate. Accordingly, this Court GRANTS the Plaintiff's motion for prejudgment interest at the federal rate of 5.10%.

The only remaining question is what time period should apply. Based on *Troy v. Bay State Computer Group*, No. 92-12267-RCL, 1997 U. S. Dist. LEXIS 2580 (D. Mass. Mar. 4, 1997), Mr. Harding urges the Court to start the running of prejudgment interest from the date of termination. However, in *Troy*, Judge Lindsay addressed a verdict for lost wages and compensatory damages, *id.* at *2, and he noted that the "plaintiff has been deprived of the use of back pay to which the court has found her entitled for the entire period." *Id.* at *27. Here, Mr. Harding claims the right to prejudgment interest on the compensatory damages award. In accordance with the Court's instructions, this portion of the jury verdict reflects "the amount of emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, and other noneconomic losses you find that Mr. Harding has undergone and can probably be expected to suffer in the future as a result of Cianbro's conduct." Tr. 1157:6-11. Thus, the award reflects damages Mr. Harding has suffered and will continue to suffer into the future; he is not entitled to prejudgment interest on the future portion of the award and he sustained the past loss incrementally, not entirely at the moment of termination. The Court concludes that the better date for commencement of prejudgment interest in this case is the date Mr. Harding filed his Complaint: September 9, 2004. *See Foley v. Lowell*, 948 F.2d 10, 17 (1st Cir. 1991). The ending date must be the date final judgment is entered. *Id.* at 18.

[15] In his Reply to the Cianbro Response, Mr. Harding acknowledged that "existing case law does not appear to support an award of prejudgment interest on punitive damages." *Pl.'s Reply* at 2. When questioned on January 3, 2007, however, Mr. Harding's counsel stated that he was still pressing the claim.

compensatory and, in monetary terms, the winner is no less well off for the chase. No similar purpose would be served by imposing interest on punitive damages which . . . have a purpose beyond restoring to a plaintiff what should have been his." *Makino*, 581 N.E.2d at 529 (internal citation omitted).

The sole First Circuit case addressing the issue is *Aetna Casualty Sur. Co. v. P & B Autobody*, 43 F.3d 1546 (1st Cir. 1994). In *Aetna*, the Court upheld the imposition of prejudgment interest on a punitive damages award, but the ruling is not binding, because the defendant failed to preserve the issue and the Court concluded that the defendant's argument was not "so clearly correct that a failure to rule in his favor . . . constitutes a miscarriage of justice." *Id.* at 1572. Also, the Court noted that "RICO damages are primarily compensatory in nature" in any event. *Id.*; *Estates of Yaron Ungar v. Palestinian Auth.*, 304 F. Supp. 2d 232, 240 (D.R.I. 2004) (noting that the discussion of prejudgment interest in *Aetna* is dictum). *Aetna* cited *Wickham Contracting Co. v. Local Union No. 3, Int'l Brotherhood of Elec. Workers,* 955 F.2d 831, 834 (2d Cir. 1992), as holding that "prejudgment interest should not be awarded when damages are punitive in nature." *Wickham* itself states flatly that "prejudgment interest is improper where the statute itself already provides for full compensation or punitive damages." *Wickham*, 955 F.2d at 835. Consistent with the majority viewpoint, the Court concludes that "prejudgment interest does not apply" to the punitive damages award in this case.[16] *Estates of Yaron Ungar*, 304 F. Supp. 2d at 240.

---

[16] The analysis for purposes of Maine law appears to be the same. Although it has not addressed the precise question here, the Maine Supreme Judicial Court has "held that prejudgment interest is a species of compensatory damages . . . ." *Moholland v. Empire Fire & Marine Ins. Co.*, 2000 ME 26, ¶4, 746 A.2d 362, 364; *Trask v. Auto. Ins. Co.*, 1999 ME 94, 736 A.2d 237. Recently, in *Town of Kennebunkport & Brian Shaw v. McCarthy*, BID-CV-04-057 (Me. Super. Ct., Yor. Cty., Nov. 16, 2006) (Brennan, J.), the Maine Superior Court waived prejudgment interest, noting that the award was not for compensatory damages, but for a monetary sanction and "monetary damages are sanctions imposed principally as a penalty and a deterrent, and do not become obligations until judgment is rendered."

### D. Whether Mr. Harding is Entitled to a Statutory Civil Penalty under 5 M.R.S.A. § 4613(2)(B)(7)

In addition to his other claims of damage, Mr. Harding initially asserted entitlement to a statutory penalty of $10,000 under 5 M.R.S.A. § 4613(2)(B)(7). *Pl.'s Mot.* at 13. However, in his Reply, Mr. Harding withdrew the demand. *Pl.'s Reply* at 2 (Docket # 175) ("Plaintiff does concur that the 1991 amendments to the MHRA preclude an award of civil penal damages in the instant case . . . .").

## III. CONCLUSION

The Court GRANTS Plaintiff Ronald Harding's demand for reinstatement at Cianbro Corporation. It ORDERS Cianbro Corporation to reinstate Mr. Harding forthwith to his position as electrical superintendent. The Court DENIES Mr. Harding's claim for front pay and his claim for prejudgment interest on the punitive damages award. The Court GRANTS Mr. Harding's claim for prejudgment interest on the compensatory damages award and ORDERS that the prejudgment interest shall run at the federal rate of 5.10 % from September 9, 2004 to the date of entry of judgment. The Plaintiff's claim for civil penalty damages under 5 M.R.S.A. § 4613(2)(B)(7) is deemed WITHDRAWN.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 11th day of January, 2007