UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| RONALD HARDING | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV-04-158-B-W |
| | ) | |
| CIANBRO CORPORATION | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON MOTION FOR JUDGMENT AS A MATTER OF LAW,
MOTION TO STAY JUDGMENT, MOTION FOR A NEW TRIAL, AND
MOTION FOR REMITTITUR**

## I. STATEMENT OF FACTS[1]

Mr. Harding, a licensed master electrician, began working for Cianbro in February 1984 and remained employed with Cianbro until he was fired in September 2002. Mr. Harding filed suit against Cianbro alleging violations of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq*., the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq*., and the Maine Human Rights Act (MHRA), 5 M.R.S.A. § 4551 *et seq*. After a six-day jury trial, the jury found that Cianbro terminated Mr. Harding's employment because of his disability and awarded him $137,000 in noneconomic damages, $563,000 in back pay damages, and $50,000 in punitive damages.[2] *Jury Verdict* (Docket # 149). Cianbro now moves for judgment as a matter of law, to stay the judgment against Cianbro, for a new trial,

---

[1] The Court previously recounted at length the facts in this case. *See Harding v. Cianbro*, 473 F. Supp. 2d 89 (D. Me. 2007).

[2] Following the jury verdict, Mr. Harding filed a motion for equitable relief seeking front pay or, alternatively, reinstatement if the Court found reinstatement practicable, prejudgment interest on his compensatory and punitive damages, and a statutory civil penalty pursuant to 5 M.R.S.A. § 4613(2)(B)(7). *Pl.'s Mot. for Equitable Relief* (Docket # 171). The Court granted Mr. Harding's demand for reinstatement, denied his claim for front pay and his claim for prejudgment interest on the punitive damages award, but granted his claim for prejudgment interest on the compensatory damages award. *Harding*, 473 F. Supp. 2d at 101.

and for remittitur; Plaintiff opposes. *Def.'s Mot. for J. as a Matter of Law, for Stay of the J., or for New Trial and/or Remittitur* (Docket # 188, 189) (*Def.'s Mot.*); *Pl.'s Opp'n to Def.'s Mot.* (Docket # 197) (*Pl.'s Opp'n*).

## II. DISCUSSION

### A. Motion for Judgment as a Matter of Law

#### 1. Legal Standard

Defendant moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a) at the close of the evidence and now renews its motion under Rule 50(b). A court may set aside a verdict and enter judgment as a matter of law if Defendant demonstrates that there is "no legally sufficient evidentiary basis for a reasonable jury to find for [the Plaintiff]...." FED. R. CIV. P. 50. Significant obstacles are entailed in such a motion. "A party seeking to overturn a jury verdict faces an uphill battle. Courts may only grant a judgment contravening a jury's determination when the evidence points so strongly and overwhelmingly in favor of the moving party that no reasonable jury could have returned a verdict adverse to that party." *Rivera v. Turabo Med. Ctr. P'ship*, 415 F.3d 162, 167 (1st Cir. 2005) (citation and quotation marks omitted); *Rivera Castillo v. Autokirey, Inc.*, 379 F.3d 4, 9 (1st Cir. 2004) ("Even in the best of circumstances, the standards for granting a motion for judgment as a matter of law are stringent."). Similarly:

> A motion for judgment as a matter of law only may be granted when, after examining the evidence of record and drawing all reasonable inferences in favor of the nonmoving party, the record reveals no sufficient evidentiary basis for the verdict. This review is weighted toward preservation of the jury verdict, which stands unless the evidence was so strongly and overwhelmingly inconsistent with the verdict that no reasonable jury could have returned it.

*Crowe v. Bolduc*, 334 F.3d 124, 134 (1st Cir. 2003) (internal citation and quotation marks omitted).

### 2.  The Evidence

Cianbro first argues that it is entitled to judgment as a matter of law because the evidence was insufficient to sustain the jury's verdict.  Cianbro maintains that Mr. Harding failed to carry his burden of proving either: (1) that Cianbro's ultimate decisionmakers knew that he suffered from a disability prior to their decision to authorize his termination, or (2) that Cianbro would not have terminated him in the absence of his disability.[3]  *Def.'s Mot.* at 2-3.

### a.  Whether Cianbro Knew Mr. Harding was Disabled

Cianbro concedes that prior to his termination, Mr. Harding informed at least one of his supervisors that he had a disability.  It argues, however, that there is no probative evidence that the persons who made the decision to terminate him were aware of his disability.  Cianbro's argument on this point is cursory: it states that "[t]he evidence at trial was undisputed that David Leavitt and Frank Susi, not Nick Bell, had the termination decisionmaking power with regard to the Plaintiff, and that neither of these officials was

---

[3] The Court previously noted:

> During trial, the parties stipulated that when Cianbro terminated him, Mr. Harding "had a disability" and that "he was a qualified individual; in other words, that he could have performed the essential functions of his position as an electrical superintendent with or without reasonable accommodation." To place this stipulation in context, the Court preliminarily instructed the jury that the Plaintiff had the burden of proof on four elements: (1) that he had a disability; (2) that when Cianbro discharged him, he was a qualified individual, meaning that he could have performed the essential functions of his position as an electrical superintendent with or without reasonable accommodation; (3) that Cianbro knew Mr. Harding had a disability; and, (4) that were it not for Mr. Harding's disability, Cianbro would not have terminated him. Based on the stipulation, the Court instructed the jury that the first two elements had been "satisfied by the stipulation" and Mr. Harding retained the burden of proof on the last two elements.

*Harding*, 473 F. Supp. 2d at 94 (internal citations omitted).

aware that Plaintiff had fibromyalgia prior to his termination."  *Def.'s Mot.* at 3.  Cianbro argues that the absence of evidence of knowledge of Mr. Harding's disability by the actual decisionmakers at Cianbro is fatal to his claim.

The Court disagrees that no reasonable jury could find that Mr. Bell had the authority to terminate Mr. Harding.  David Leavitt testified:

> Q.  Do you remember having a conversation with Nick Bell sometime after this meeting about Mr. Harding – Mr. Harding's employment situation?
> A.  Yeah.  I seem to recall that Nick was with me when we went out there and saw this, and on our way back or through some other part of the job, I said, you know, if this continues, this type of behavior, and not being supportive of our safety rules, you know, if this continues, if there's another event like this, *you can cut him loose*.

*Tr.* at 719:14-22.[4]  Mr. Bell concurred:  "[Mr. Leavitt and I] had a conversation, and I do not remember it verbatim.  But, you know, it was pretty much up to me to choose whether – whether or not I thought Ronny should continue working for Cianbro Corporation."  *Tr.* at 851:17-23.  Sometime in September 2002, Mr. Bell called Mr. Harding into his office and fired him.[5]  *Tr.* at 430:13-25, 431:1-18.  Based on this testimony alone, a reasonable jury could find that Mr. Leavitt extended to Mr. Bell the authority to terminate Mr. Harding if he acted up again and, that when Mr. Bell terminated Mr. Harding, he exercised that authority.[6]

---

[4] The transcripts are located at Docket # 178-183.

[5] Mr. Bell also testified that he contacted Frank Susi to obtain permission to fire Mr. Harding.  *Tr.* at 854:11-25, 855:1.  If so, there is evidence from which a jury could reasonably find that Mr. Bell gave Mr. Susi incomplete or inaccurate information.  If so, this would present a separate basis for imposing liability.  *See infra* Part II.B.

[6] There was countervailing evidence that Mr. Bell neither retained nor exercised the ultimate authority to terminate Mr. Harding and that Frank Susi, the man who did retain that authority, was unaware of Mr. Harding's fibromyalgia.  Mr. Leavitt testified that after his conversation with Mr. Bell, Mr. Bell came back to him and recommended that Mr. Harding be terminated; Mr. Leavitt further testified that he then took the issue up with Frank Susi, his boss, and it was only after receiving Mr. Susi's approval that Mr. Harding was terminated.  *Tr.* at 721:17-22, 722:7-23, 753:21-24.  But, at this stage, Cianbro must demonstrate that no reasonable jury could have found that Mr. Leavitt gave Mr. Bell termination authority and that Mr. Bell exercised it.  In view of the testimony of both Mr. Leavitt and Mr. Bell, Cianbro cannot sustain its burden.

**b.  Whether Cianbro Would Have Fired Mr. Harding Regardless of his Disability**

Cianbro next claims it would have fired Mr. Harding in any event and its decision to terminate him had nothing to do with his disability.  Specifically, Cianbro focuses on evidence that Mr. Harding did not meet Cianbro's legitimate job performance expectations, citing complaints from managers about Mr. Harding's negativity, his tendency to foster a contentious working environment, and other instances of "egregious misconduct."  *Def.'s Mot*. at 4.  Cianbro states that Mr. Harding "engaged in what can only be characterized as insubordination, back-biting, and career-ending behavior . . . ." *Id*. at 6.  Cianbro continues:

> The only admissible evidence of pretext in this case, which should not have been presented to the jury in light of Plaintiff's failure to prove his prima facie case, was the temporal "proximity"— five weeks — between Plaintiff's disclosure of his fibromyalgia diagnosis and his termination, and Bell's alleged "stern" reaction to hearing of the diagnosis. However, a "narrow focus" on timing "ignores the larger sequence of events and also the larger truth." *Soileau v. Guilford of Maine*, 105 F.3d 12, 16 (1st Cir. 1997) (holding that timing alone was insufficient to prove causation where the plaintiff was warned of his performance problems and put on a performance plan before he ever requested accommodation). As the case law clearly provides, "chronological proximity will not by itself establish causality where the larger picture undercuts any claim of causation." *Eaton v. Kindred Nursing Centers West LLC*, 2005 WL 1185802 (D. Me., May 19, 2005) quoting *Soileau*, 105 F.3d at 16. *See also Testa v. Town of Madison*, Civil No. 04-185-B-W (Recommended Decision on Motion for Summary Judgment, September 26, 2005). This is particularly so when the termination at issue is equally proximate in time to serious incidents of misconduct.

*Def.'s Mot*. at 5.

In *Clark County School District v. Breeden*, the Supreme Court states that the cases that "accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima

facie case uniformly hold that the temporal proximity must be 'very close.'" 532 U.S. 268, 273 (2001) (citation omitted). *Clark County* cited circuit cases where three-month and four-month periods of time between the employer's knowledge and the termination were deemed insufficient. *Id. Clark County* is consistent with prior First Circuit authority, holding that "protected conduct closely followed by adverse action may justify an inference of retaliatory motive." *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 168 (1st Cir. 1998).

Following *Clark County*, the First Circuit addressed temporal proximity in the context of a Title VII retaliation claim.[7]  The First Circuit stated:  "A showing of discharge soon after the employee engages in an activity specifically protected by . . . Title VII . . . is indirect proof of a causal connection between the firing and the activity because it is strongly suggestive of retaliation."  *Calero-Cerezo v. United States DOJ*, 355 F.3d 6, 25 (1st Cir. 2004) (quoting *Oliver v. Digital Equip. Corp.*, 846 F.2d 103, 110 (1st Cir. 1988)).   It

---

[7] Although Mr. Hardings' claims are not retaliation claims, the rationale behind temporal proximity would seem to apply with equal force to ADA claims.  Further, courts commonly consider temporal proximity in a variety of discrimination contexts, including disability discrimination, racial discrimination, discrimination based on national origin, pregnancy discrimination, and discrimination based on military activity.  *See, e.g. Velazquez-Garcia v. Horizon Lines of P.R., Inc.*, 473 F.3d 11 (1st Cir. 2007) (addressing temporal proximity between military activity and employer action under the Uniformed Services Employment and Reemployment Rights Act of 1994); *Hussain v. Highgate Hotels, Inc.*, 126 Fed. Appx. 256, 263 (6th Cir. 2005) ("Statements made by an immediate supervisor and decision maker, that specifically and derogatorily reference an employee's national origin and that are in a close temporal proximity to the termination decision, present sufficient evidence of causation.  Conversely, a weaker temporal proximity requires a greater quantum of evidence than in cases with a tighter time line of events.") (citations omitted); *Vesprini v. Shaw Contract Flooring Servs.*, 315 F.3d 37, 41-42 (1st Cir. 2002) (noting that, in an age discrimination case, "[t]he lack of temporal proximity between these remarks and the ensuing disciplinary action . . . severely undermines the reasonableness of any inference that there existed a causal relationship between the remarks and the subsequent decisionmaking . . . ."); *Walerstein v. Radioshack Corp.*, 04 CV 1096 (SJ) (SMG), 2007 U.S. Dist. LEXIS 24768, at *16-17 (E.D.N.Y. Mar. 30, 2007) (finding that the temporal proximity between plaintiff's manager questioning whether plaintiff's disability would prevent him from performing his duties and his firing of plaintiff supported an inference that plaintiff's termination was the result of discrimination); *Asmo v. Keane, Inc.*, 471 F.3d 588, 593 (6th Cir. 2006) ("Temporal proximity can also satisfy the nexus requirement in the pregnancy discrimination context."); *DiCarlo v. Potter*, 358 F.3d 408, 417 (6th Cir. 2004) (finding that in a national origin discrimination case, "temporal proximity between the discriminatory act and the termination creates a . . . scenario, such that causation may be demonstrated with a lesser quantum of evidence than in other cases not involving such a tight time line of events."); *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994) ("Three types of circumstantial evidence of intentional discrimination can be distinguished.  The first consists of suspicious timing. . . ."); *Bilodeau v. Mega Indus.*, 50 F. Supp. 2d 27, 44 (D. Me. 1999) ("close temporal proximity between two events may give rise to an inference of a causal connection.").

concluded that where the employee "received her first proposed suspension . . . roughly a month after she made defendants aware that she filed her EEO complaint, we find the plaintiff has met her burden of making out a prima facie case of retaliation." *Id.* at 26; *see also Noviello v. City of Boston*, 398 F.3d 76, 86 (1st Cir. 2005) (noting in a Title VII case that "[w]hen harassment follows hard on the heels of protected activity, the timing often is strongly suggestive of retaliation.").

Here, the evidence is that Mr. Harding notified Cianbro that he was suffering from fibromyalgia in early August, and approximately five weeks later, Cianbro fired him. Cianbro had employed Mr. Harding for over eighteen years before it terminated him in September 2002; his long-term employment makes it less likely that its decision to terminate within weeks of the revelation of his fibromyalgia is purely coincidental to that recent revelation.   In the circumstances of this case, consistent with *Calero-Cerezo*, the Court concludes that the five-week interval between knowledge and termination is sufficiently close to sustain Mr. Harding's *prima facie* case of disability discrimination. *See Zades v. Lowe's Home Ctrs., Inc.*, 446 F. Supp. 2d 29, 44 (D. Mass. 2006) (concluding that the employee made out a *prima facie* age discrimination case when the temporal gap between the employee's request for accommodations and her termination was two months and when there was evidence that one of the managers was hostile to her request); *McCray v. H&R Block E. Enters.*, No. 04-12232-PBS, 2006 U.S. Dist. LEXIS 29068, at *18 (D. Mass. May 10, 2006) ("As Plaintiff was terminated approximately six weeks after Defendants became aware of his filing of an MCAD complaint, the two events were 'very closely connected in time.'") (citation omitted).

On this point, Cianbro's reliance on *Soileau* and *Eaton* is unconvincing, due to factual differences among the cases.  In *Soileau*, the First Circuit noted that the employee had been disciplined and warned before the employer was aware he was asserting that he was disabled. *Soileau*, 105 F.3d at 16.  *Soileau* was concerned that Mr. Soileau's argument "would permit an employee already on notice of performance problems to seek shelter in a belated claim of disability."  *Id.* at 17 n.5.  In this vein, the First Circuit commented that "[t]here is no other evidence tending to support the retaliation claim."  *Soileau*, 105 F.3d at 17.  *Soileau* stands for the proposition that timing alone – when contradicted by the "larger sequence of events and also the larger truth" – may be insufficient.  *Id.* at 16.  Similarly in *Eaton*, Magistrate Judge Kravchuk concluded that evidence of a ten-week period between the protected activity to the termination was insufficient to sustain the employee's burden of proof, but concluded that she was "far more comfortable recommending that the court enter a dispositive ruling based on the totality of the evidence in the case . . . ."  *Eaton*, 2005 WL 1185802, at *10.

Here, unlike *Soileau* or *Eaton*, there was a sizable amount of evidence beyond temporal proximity supporting Mr. Harding's claims.  Even though Cianbro is able to point to abundant trial testimony suggesting that Mr. Harding had a negative outlook, was a poor communicator, and could be "just miserable," *Harding*, 473 F. Supp. 2d at 91, and Cianbro offers Mr. Harding's irascible personality as the true reason for his termination, the evidence amply demonstrated that Mr. Harding had always been this way and it was not until just after Cianbro learned that he had fibromyalgia that it decided to take action.  Further, there was substantial disagreement within Cianbro management about Mr. Harding and the supposed shortcomings in his personality.  Some supervisors at Cianbro received positive feedback after assigning Mr. Harding to a job.  Equally important, there was testimony that, although

there had been complaints about Mr. Harding, the number of complaints was similar to complaints about other Cianbro employees. Even when Mr. Harding was involved in disagreements with other employees, the evidence revealed that many of these disagreements were later resolved without further difficulty.

Moreover, the evidence of Mr. Harding's ability and skill level as a Cianbro employee was unquestionably flattering: no one questioned his competence. The Court earlier stated that "the evidence confirms that Mr. Harding is an excellent electrical supervisor; even the Cianbro employees who were uncomplimentary about his personality praised his competence." *Id*. at 97. This goes to the heart of Cianbro's current contention that Mr. Harding somehow did not satisfy Cianbro's job performance expectations.

The evidence strongly suggests that from February 1984 until September 2002, Cianbro was willing to tolerate Mr. Harding's personality quirks because of his technical expertise, but something happened in the late summer of 2002 that caused Cianbro to change its mind and fire him. Cianbro claims that Mr. Harding:

> griped behind co-worker Mike Ritchie's back about his plan for temporary power, repeatedly demeaned another employee, Jamie Marquis, by calling him a derogatory name in front of Marquis' direct reports, installed power to a portal crane in a manner directly contrary to the company's plan and the customer's directive, costing the company thousands of dollars to fix, and meddled with Marty Roach's crew, redirecting the crew members in a manner that undermined Roach and created a contentious working environment.

*Def.'s Mot*. at 4. Given this litany, a jury could have concluded that Cianbro terminated Mr. Harding for reasons other than his fibromyalgia, but it was not compelled to do so, particularly since Cianbro itself amassed an impressive array of evidence that Mr. Harding's entire career had been marked by similar incidents. In short, in a result that is admittedly

counterintuitive, evidence of the persistence and longevity of Mr. Harding's notable cantankerousness assists his case.

The totality of the evidence is more than sufficient to allow a reasonable jury to make a finding in favor of Mr. Harding. In fact, as the jury found it, this was not a particularly close case; the jury determined that Cianbro's discrimination was sufficiently egregious to impose punitive damages.[8] The Court cannot conclude that the evidence points so strongly and overwhelmingly in favor of Cianbro that no reasonable jury could have returned a verdict for Mr. Harding. *See Rivera Castillo*, 379 F.3d at 9. The Court denies Cianbro's motion for judgment as a matter of law.

### B. Subordinate Bias Liability[9]

Cianbro raises the question of subordinate bias liability: whether an employer may be held liable for discrimination based on a subordinate supervisor's discriminatory animus, absent proof that the persons who actually made the termination decision harbored any improper animus towards the employee. *See EEOC v. BCI Coca-Cola*, 450 F.3d 476 (10th Cir. 2006) (*BCI*).

"[C]ircuit courts have applied at least three distinct approaches to the 'subordinate bias' theory." *Foroozesh v. Lockheed Martin Operations Support, Inc.*, No. 2:03cv1703, 2006 U.S. Dist. LEXIS 77179, at *7-9 (W.D. Pa. Oct. 10, 2006). At one end of the spectrum,

---

[8] The Court instructed the jury that it was "entirely up to [them] whether or not to award punitive damages, but that it should be presumed that Mr. Harding has been made whole by compensatory damages." *Harding*, 473 F. Supp. 2d at 94. The Court further instructed the jury that it should award punitive damages "only if Cianbro's culpability is so reprehensible as to warrant further sanctions to achieve punishment or deterrence." *Id*. at *15.

[9] Cianbro moved to stay this Court's action on the post-trial motion pending the outcome of *BCI Coca-Cola Bottling Company v. EEOC*, 127 S. Ct. 852 (2007), then before the United States Supreme Court. On January 7, 2007, the Supreme Court had granted the petition for writ of certiorari on *BCI*. However, on April 12, 2007, the Court dismissed the writ pursuant to its Rule 46.2. 2007 U.S. LEXIS 4333, at *1 (Apr. 12, 2007). Although Cianbro has not formally reacted, the dismissal eclipses Cianbro's argument for a stay and the Court DENIES Cianbro's motion for stay. Presumably, the issue remains alive to the extent it could provide an independent basis for a new trial or judgment as a matter of law.

"subordinate bias" liability is available when the subordinate with discriminatory animus provides input that "may have affected the adverse employment action." *Id.* at *8 (quoting *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1459 (7th Cir. 1994)).  At the other end of the spectrum, subordinate bias liability is only available if the biased subordinate is "the actual decisionmaker;" liability may not be imposed even if the subordinate exercised "substantial influence" or played a "significant role" in the decision. *Id.* at *9 (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 290-91 (4th Cir. 2004) (en banc)).  The middle ground, expressed in *BCI*, is "whether the biased subordinate's discriminatory reports, recommendation, or other actions caused the adverse employment action." *Id.* (quoting *BCI*, 540 F.3d at 487).[10]

The First Circuit currently holds with those in the middle ground.  In *Azimi*, the First Circuit stated that to make out an employment discrimination case, the employee must demonstrate either that the actual decisionmaker harbored an impermissible bias or that the "neutral decisionmaker [was] induced to act based on inaccurate information provided because of the provider's discriminatory animus." 456 F.3d at 248 n.14; *see also Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 10 (1st Cir. 1990) ("The biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case."); *Cariglia v. Hertz Equip. Rental Corp.*, 363 F.3d 77, 85

---

[10] In *BCI*, the Tenth Circuit explained "cat's paw" saying:

> In the employment discrimination context, 'cat's paw' refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action.  The 'rubber stamp' doctrine has a more obvious etymology, and refers to a situation in which a decisionmaker gives perfunctory approval for an adverse employment action explicitly recommended by a biased subordinate.

*Id*. at 484 (internal citations omitted); *see also Oakstone v. Postmaster Gen.*, 332 F. Supp. 2d 261, 272-74 (D. Me. 2004).

(1st Cir. 2004) ("[T]he biases of those who do make or influence the employment decision are probative.").

Here, Cianbro's argument is unpersuasive. As the Court earlier described, the jury could have reasonably concluded that Nick Bell, the supervisor who was aware of Mr. Harding's disability, made the decision to terminate him. As such, the verdict is sustainable, even under the narrow Fourth Circuit approach and, by extension, under any of the circuit positions. Cianbro fails to make the requisite "strong showing that [it] is likely to succeed on the merits."[11]   *Hilton*, 481 U.S. at 776. To the extent Cianbro asserts that the case law restrictions on subordinate bias liability mandate a new trial or judgment as a matter of law, the Court rejects this contention.[12]

### C.  Motion for a New Trial

#### 1.  Legal Standard

Rule 59 permits a party to move for a new trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States . . . ." FED. R. CIV. P. 59(a). "The decision to grant a new trial is squarely within the trial court's discretion." *Velazquez v. Figueroa-Gomez*, 996 F.2d 425, 427 (1st Cir. 1993). Still, a trial court's "discretion is quite limited concerning motions for new trials. A trial judge may not

---

[11] Another problem is that First Circuit law on this issue is clear and this Court is required to apply that law under the doctrine of *stare decisis*. *Gately v. Massachusetts*, 2 F.3d 1221, 1226 (1st Cir. 1993). A district court within the circuit is "hard put to ignore that precedent unless it has unmistakably been cast into disrepute by supervening authority." *Eulitt v. Me. Dep't of Educ.*, 386 F.3d 344, 349 (1st Cir. 2004). Under current First Circuit authority, there is evidence that Mr. Bell was the person who contacted Frank Susi and influenced his approval by providing him inaccurate or incomplete information. Under *Azimi*, this evidence is sufficient to meet the First Circuit standard. This is not a circumstance where the First Circuit has been silent on an issue or has suggested unease with the continued vitality of its precedent.

[12] Cianbro has also failed to demonstrate the other *Hilton* criteria. *See Hilton*, 481 U.S. at 776. There is no showing that it will be irreparably injured. The remedies here include the payment of money damages and Mr. Harding's return to work, neither of which constitutes irreparable injury. The third criterion, injury to other parties, does not apply. The fourth criterion, where the public interest lies, may be debatable, but a strong argument can be made that the public interest lies primarily in assuring that victims of illegal discrimination receive prompt compensation.

upset the jury's verdict merely because he or she might have decided the case differently." *Velazquez,* 996 F.2d at 428.   Rather, trial judges "may grant a new trial only if they are convinced that the verdict is against the clear weight of the evidence, such that letting it stand would result in a miscarriage of justice." *Valentin-Almeyda*, 447 F.3d at 104.   The judge "must be careful not to invade the jury's province." *Id.*

### 2.   The Evidence

### a.   Rebuttal Evidence – Harold Smith

The first contention is that the Court improperly admitted rebuttal testimony concerning a conversation between Cianbro employee, Harold Smith, and Mr. Bell.   As the First Circuit has stated, "[r]ebuttal evidence may be introduced to explain, repel, contradict or disprove an adversary's proof [and] its admissibility is a matter for the trial court's discretion." *United States v. Laboy*, 909 F.2d 581, 588 (1st Cir. 1990).   Defendant concedes that "[t]he fact that testimony would have been more proper for the case-in-chief does not preclude the testimony if it is proper both in the case-in-chief and in the rebuttal." *United States v. Luschen*, 614 F.2d 1164, 1170 (8th Cir. 1980).   Nonetheless, Defendant argues the testimony offered as "rebuttal" was never raised by the Defendant during trial, was error, and unfairly prejudicial:

> Defendant did not raise the issue of Harold Smith or any conversation between Harding and Nick Bell about Smith during trial. Plaintiff's counsel, however, cross-examined Bell as to whether he had told Harding that he (Bell) did not care about the age and disability laws.   The Court then allowed Plaintiff's counsel to recall Harding to testify on rebuttal that he did not believe Smith should have been let go, that he expressed concerns to Bell about the legal ramifications of letting him go, and that Bell responded: "I don't give a fuck, I've been in court before and I'll be in court again . . . I don't care. Cianbro's got to pay the bills. I don't."

*Def.'s Mot.* at 8-10 (citations omitted).  Mr. Harding responds:

> The testimony regarding the Harold Smith conversation was relevant in that it directly contradicted the testimony of Cianbro's Human Resources Manager, [who] testified that Cianbro is aware of the state and federal anti-discrimination laws and has its own internal antidiscrimination policies; she further testified that Cianbro has a habit of conforming with those policies and laws and has an extensive history of accommodating employees with work restrictions. [The Human Resources Manager] thus opened the door to the line of questions Plaintiff posed to Nick Bell regarding the Harold Smith conversation when she alleged that Cianbro nearly always accommodates disabled workers and never unlawfully discriminates. Plaintiff's counsel questioned Bell with respect to Mr. Smith; when Bell denied ever having made the statements, Plaintiff was entitled to contradict Bell with Plaintiff's own testimony.

*Pl.'s Opp'n* at 11 (citations omitted).

The Court concludes that the rebuttal testimony was properly admitted on a number of bases.  The extent of Cianbro's adherence to antidiscrimination laws was patently relevant, particularly since Cianbro unquestionably opened the door to further inquiry when it offered testimony that Cianbro has been not only aware of state and federal discrimination laws, but that it has routinely gone to great lengths to make certain its supervisors comply with the laws regarding disabled employees.[13]  Since Cianbro adduced this evidence in its case-in-chief, Mr. Harding was well within bounds to probe whether Cianbro carried out its self-proclaimed policies and procedures with regard to a specific employee.

The questioning was particularly relevant because the witness was Mr. Bell: the same supervisor Mr. Harding contended was guilty of discriminatory animus toward him.  Mr. Bell was specifically asked on cross-examination whether Mr. Harding asked him to retain Mr.

---

[13] Cianbro Human Resources Manager testified that she "could count the number of times on one hand that [Cianbro has] not been able to hire somebody because of a physical work restriction – less than six." *Tr.* at 637:12-18.  She went on to describe an elaborate process by which Cianbro assures itself that the supervisors in the field respect such restrictions. *Tr.* at  638:20-25; 639:1-9.

Smith on the job for an additional six months to allow Mr. Smith to obtain retirement benefits and Mr. Bell acknowledged that he thought Mr. Harding may have felt that Cianbro should keep Mr. Smith on.  *Tr.* at 916:8-14.  Despite Mr. Harding's sentiment, Cianbro decided that Mr. Smith had to retire, because of his medical condition.  *Tr.* at 916:15-22.  Mr. Bell then admitted that he had required Mr. Harding to escort Mr. Smith off the job site.  *Tr.* at 916:9-12.  Mr. Bell could not, however, recall Mr. Harding telling him that he (Mr. Harding) believed that in its treatment of Mr. Smith, Cianbro was violating the age and disability discrimination laws; Mr. Bell emphatically denied ever telling Mr. Harding that he did not care about those laws, that he did not care because he had had those complaints before and would have them again, and that he did not care because it was Cianbro, not Mr. Bell, that ended up paying.  *Tr.* at 917:18-25, 918:1-8.  Mr. Harding elicited all this testimony without objection by Cianbro.

Once Mr. Bell emphatically denied ever making these statements, the question was whether Mr. Harding had the right to rebut his denial.  Cianbro argues that a party may not introduce extrinsic evidence of specific instances of conduct to attack a witness's character for truthfulness.  Cianbro does not dispute that under Federal Rule of Evidence 608(b) Mr. Harding could cross-examine Mr. Bell on this conversation, but it contends that, once Mr. Bell denied it, Mr. Harding could not introduce rebuttal evidence to suggest that Mr. Bell was not telling the truth.

Cianbro is correct only to a limited extent.  Its argument construes Rule 608(b) too narrowly and assumes that the rule serves as a categorical bar on all extrinsic evidence of specific instances of conduct.  Rather, Rule 608(b) prohibits only the introduction of extrinsic evidence of specific instances of conduct to attack a witness's "character for truthfulness."

In 2003, the advisory committee clarified the distinction between impeachment by contradiction and impeachment of character by replacing the word, "credibility," with "character for truthfulness."  The Advisory Committee explained:

> The Rule has been amended to clarify that the absolute prohibition on extrinsic evidence applies only when the sole reason for proffering that evidence is to attack or support the witness' character for truthfulness. . . . The amendment conforms the language of the Rule to its original intent, which was to impose an absolute bar on extrinsic evidence only if the sole purpose for offering the evidence was to prove the witness's character for veracity. . . . By limiting the application of the Rule to proof of a witness's character for truthfulness, the amendment leaves the admissibility of extrinsic evidence offered for other grounds of impeachment (such as contradiction, prior inconsistent statement, bias and mental capacity) to Rules 402 and 403.

FED. R. EVID. 608(b), advisory committee note (2003).  "Extrinsic evidence of specific conduct may be admitted for other purposes, such as to show matters such as a party's or a witness's motive, intent, opportunity, knowledge, or bias."  4-608 WEINSTEIN'S FEDERAL EVIDENCE § 608.20[3][b]; *see also United States v. Gomes*, 177 F.3d 76, 81 (1st Cir. 1999) ("extrinsic evidence is admissible to show bias"); *United States v. Rojo-Alvarez*, 944 F.2d 959, 970 (1st Cir. 1991) (upholding admission of extrinsic evidence to show consciousness of guilt).

The Court properly allowed Mr. Harding to testify that when he warned Mr. Bell that Cianbro could end up in court for its treatment of Mr. Smith, Mr. Bell responded in no uncertain terms that he did not care, that he had been in court before and would be again, and that, in any event, Cianbro ends up paying the bills.  *Tr.* at 1125:14-21.  This evidence constituted impeachment by contradiction and was probative of Mr. Bell's bias and motivation – whether the person who had fired Mr. Harding harbored an antipathy for the

legal rights of the disabled.   It also rebutted Cianbro's claim that it maintained strict compliance with federal and state discrimination laws.[14]  The Court rejects Cianbro's claim of error in the admission of Mr. Harding's rebuttal testimony.

### b.  Rebuttal Evidence – Peter Schein

Cianbro's second point of contention is that the Court improperly admitted rebuttal testimony concerning a physical threat that Mr. Leavitt allegedly made towards Mr. Schein. Cianbro argues that it was an attempt at impeachment on a collateral matter barred by Rule 608(b).  *See* FED. R. EVID. 608(b); *United States v. Beauchamp*, 986 F.2d 1, 3 (1st Cir. 1993).

To place the testimony in context, Cianbro's main defense to Mr. Harding's allegations was that it terminated him not because of his fibromyalgia, but because he had a long history of untoward conduct.   To prove this point, Cianbro called Mr. Leavitt as a witness.[15]  Mr. Leavitt was Nick Bell's supervisor and there was also testimony that Mr. Leavitt had sought authority from his boss, Frank Susi, to fire Mr. Harding.   Mr. Leavitt testified on direct examination that, in making the decision to terminate Mr. Harding, he considered Mr. Harding's work history, including an incident at the so-called Phoenix Project in 1996.  *Tr.* at 707:8-25, 708:1-6.  The incident involved a physical altercation between Mr. Harding and another employee, Mike Ritchie.  *Id.*  Mr. Leavitt said that when he heard about the incident in 1996, "I did think it was serious.  I thought it was deserving of Ron being fired."  *Tr.* at 709:5-9.

---

[14] The Court allowed Cianbro to have the last word on the issue by allowing Cianbro to recall Mr. Bell, who – as the last trial witness – restated his denials.  *Tr.* at 1142:17-25; 1143:1-16.

[15] The Court recognizes that in describing this evidence, it is recounting a version of events different from its earlier rendition regarding whether Mr. Bell alone had the authority, and made the decision, to terminate Mr. Harding.  When it made its evidentiary ruling, the Court could not know what version of the evidence the jury was going to accept.

Peter Schein[16] was involved in the Phoenix Project as well. During direct examination of Mr. Schein, Mr. Harding attempted to bring out evidence that Mr. Leavitt himself had had a physical confrontation with Mr. Schein at the Phoenix Project. *Tr.* at 563:16-25, 564:1-25, 565:1-25, 566:1-25, 567:1-24. This evidence, as proffered, went to whether Mr. Leavitt was acting inconsistently – in firing Mr. Harding in part for something akin to what Mr. Leavitt himself had done – and, by inference, that the true motive for his terminating Mr. Harding was not his prior conduct, but his disability. However, the Court sustained Cianbro's objection to Mr. Schein's testimony, as Mr. Leavitt had not yet testified and it improperly anticipated Mr. Leavitt's denial.

On cross-examination of Mr. Leavitt, Mr. Harding asked him without objection whether he had had a confrontation with Mr. Schein at the Phoenix Project and, if so, whether he threatened to physically assault Mr. Schein. *Tr.* at 737:4-25, 738:1-25, 739:1-2. Mr. Leavitt emphatically denied this incident. *Tr.* at 737:9 ("Absolutely not"); 737:11 ("That never happened"); 738:22 ("I don't – this never happened."). In rebuttal, Mr. Harding proposed to call Mr. Schein to testify that the incident with Mr. Leavitt did in fact occur and that Mr. Leavitt had threatened him physically. The Court allowed Mr. Schein's testimony over Cianbro's objection. Mr. Schein testified that during the Phoenix Project Mr. Leavitt had come into his office and said: "I will knock you down, I will beat you up." *Tr.* at 1115:5-9. He explained that Mr. Leavitt was upset because Mr. Schein had failed to attend an important meeting. *Tr.* at 1115:12-15.

Whether Mr. Schein should have testified in rebuttal was a closer call, given the danger that the jury would be sidetracked by the collateral matter of whether Mr. Leavitt did or did not threaten to assault Mr. Schein. However, the evidence was probative of several

---

[16] Mr. Schein was Mr. Harding's long-term mentor and advocate within Cianbro.

issues.  First, it was impeachment by contradiction; Mr. Leavitt denied the confrontation and Mr. Schein was prepared to testify to the contrary.  As the First Circuit has said, the admissibility of this type of evidence is subject to a requirement of materiality.  *United States v. Perez-Perez*, 72 F.3d 224, 227 (1st Cir. 1999).[17]  If Mr. Leavitt had not testified that he thought that Mr. Harding should have been fired for his altercation at the Phoenix Project and that he considered the altercation when he made his decision in 2002 to fire him, the dispute between Mr. Leavitt and Mr. Schein would have been immaterial; however, once Mr. Leavitt made these statements, evidence that other employees, including himself, had engaged in similar conduct without repercussion became material.  Mr. Schein's rebuttal testimony was probative of Mr. Leavitt's bias against Mr. Harding, his improper motivation in terminating Mr. Harding, and his application of inconsistent standards.  The Leavitt-Schein dispute was material within the constraints of *Perez-Perez*.

Finally, this issue spanned only moments of a six-day jury trial.  In evaluating the Rule 403 impact of Mr. Schein's exceedingly brief testimony, the probative value was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury.  FED. R. EVID. 403.  The Court rejects Cianbro's objection to the admission of Mr. Schein's rebuttal testimony.

### D.  Motion for Remittitur

Finally, Cianbro argues that the damage award is excessive, unsupported by the evidence, and should be remitted.  *Def.'s Mot*. at 12.  Specifically, Cianbro claims: (1) the back pay award should be reduced because Plaintiff failed to make reasonable efforts to seek

---

[17] The First Circuit noted that "impeachment by contradiction is a recognized mode of impeachment not governed by Rule 608(b). . . . But, again largely for reasons of efficiency, extrinsic evidence to impeach is only admissible for contradiction where the prior testimony being contradicted was itself material to the case at hand."  *Perez-Perez*, 72 F.3d at 227.

alternative employment; (2) the back pay award includes stock grants that Plaintiff would not have received even if he had continued working at Cianbro; (3) Plaintiff is not entitled to recover certain lost benefits, including health and welfare benefits and Cianbro's payment of additional taxes incurred for the stocks Plaintiff would not have received; (4)   the noneconomic damage award is excessive and unsupported by the evidence; and (5) the punitive damage award is unsupported by the evidence.  *Id*. at 12-19.

### 1.   Reduction of the Back Pay Award Based on Plaintiff's Alleged Failure to Make Reasonable Efforts to Seek Alternative Employment

The First Circuit has held that "[a] prevailing ADA claimant is presumptively entitled to all back pay which would have accrued from the termination date to the entry of judgment, provided it is made to appear that reasonable diligence [was exercised in the effort to secure] other suitable employment."[18]   *Quint v. A.E. Staley Mfg. Co.,* 172 F.3d 1, 15-16 (1st Cir. 1999).  The Court continued: "As long as the claimant has made some effort to secure other employment, the burden to prove failure to mitigate normally resides with the defendant-employer . . . which then must show that (i) though substantially equivalent jobs were available in the relevant geographic area, (ii) the claimant failed to use reasonable diligence to secure suitable employment."  *Id*. at 16 (internal citations omitted); *Carey v. Mt. Desert Island Hosp.*, 156 F.3d 31, 41 (1st Cir. 1998) ("[T]he employer [bears] the burden of proof on the issue of mitigation.").  Further, the employee's obligation "to accept substantially equivalent employment extends only to jobs available in the relevant geographic area." *Currier v. United Techs. Corp.*, 326 F. Supp. 2d 145, 157 (D. Me. 2004) (internal punctuation and citation omitted).

---

[18] The Court instructed the jury on Mr. Harding's duty to mitigate his damages and that he would not be entitled to any damages he could reasonably have avoided incurring.  *Tr.* at 1157:25; 1158:1-6; *Def.'s Mot*. at 12; *Pl.'s Opp'n* at 14.

Cianbro's point on mitigation must be that Mr. Harding failed to demonstrate that he had made "some effort" to secure other employment.   According to Cianbro, the evidence showed that Mr. Harding made almost no effort to secure alternative employment, that additional jobs would have been readily available to him if he had been willing to become a union member, that he virtually withdrew from the job market and, as such, his back pay award should be reduced by $290,245.  Mr. Harding, in turn, states:

> Harding did not "virtually withdraw" from the labor market after he lost his job . . . . Rather, he testified that after looking for work, some four months later he obtained a job . . . as an electrical superintendent, which fell through when the actual job proved to be that of an electrician, whose physical demands were far more extensive.  He also called people he knew in the trade; contacted employers he had contacted before . . . checked on the internet; contacted the IBEW Union; and reviewed the newspapers.  Nor did Harding turn down union work . . . [A vocational expert] supplemented Harding's testimony, corroborating that the labor market for electrical superintendents has been very limited in Maine since Plaintiff's termination.   She testified that Harding's work search conformed "exactly" with the recommendations that she would make to her clients.

*Pl.'s Opp'n* at 15.

Cianbro makes no claim that the Court improperly instructed the jury on this issue; instead, it asserts that the jury erred in evaluating the facts.  Having failed to convince the jury of the facts, Cianbro now bears the heavy burden to convince the Court that the jury erred as a matter of law.  One problem for Cianbro is that Mr. Harding actually did obtain employment after he was terminated.  Mr. Harding testified that after he "searched around quite a lot . . . [he] ended up with a company called S & L Construction" in late November, 2002.  *Tr.* at 438:18-25, 439:1-6.  Mr. Harding stopped working for S & L in February 2003 when S & L went out of business.  *Tr.* at 443:17-18.  In mid-July 2005, Mr. Harding obtained

another job, this time with J & M Logging, a business owned by his nephew and he was still

working for J & M at the time of the trial.  *Tr.* at 447:25; 448:1-21.  Cianbro's argument that

Mr. Harding failed to make "some effort" to obtain employment is made more difficult by

the fact that he found two jobs, thereby demonstrating "some effort."

Cianbro focuses its argument on the period from February 2004 to the present,

arguing that since February 2004, Mr. Harding made virtually no effort to become employed,

that he inappropriately restricted his job search, and that from mid-July, 2005 onward, he has

been underemployed.  Mr. Harding testified that after he was terminated by S & L in

February 2003, he looked in the newspapers and on the internet for employment, including

the IBEW website and he contacted people he had "known in the past in the trade."  *Tr.* at

444:2-4, 9-19.  He revealed that, at one point, he was offered work as an electrical supervisor

with SWB in Jay, Maine, but the offer was withdrawn and instead he was offered an entry

level job as an electrician that was beyond his physical ability.[19]  *Tr.* at 445:4-25, 446:1-23.

Mr. Harding also testified that after leaving work at S & L, he sought work at a number of

other contractors.  *Tr.* at 447:12-24.

In addition, Mr. Harding presented the testimony of Margaret Robinson, a vocational-

rehabilitation counselor, who met him twice, March 2005 and July 5, 2006.  *Tr.* at 202: 12-

18. *See Carey*, 156 F.3d at 41 (referring to the use of expert testimony on the issue of

mitigation).  She performed a labor market survey for electrical superintendent positions in

March 2005 and July 2006 and found that none of the employers she contacted was hiring.

*Tr.* at 228:7-10, 238:4-22.   She testified that the market for electrical superintendents was

"extremely limited, in fact, nonexistent."  *Tr.* at 241:9-11.

---

[19] Mr. Harding's testimony on this point is confusing, since he fixed the time of this job offer as June 2002, when he was still working for Cianbro.  *Tr.* at 445:16-18.  In the context of the questioning, however, it seems clear that Mr. Harding was discussing his efforts at finding work after he left S & L in February 2003.

Based on the evidence, the jury acted well within its fact-finding role in determining that he met his mitigation obligation and made "some effort" to find work. The Court cannot agree with Cianbro that "no reasonable jury . . . could have found that . . . Mr. Harding made a 'reasonable effort' to mitigate his back pay damages." *Def.'s Mot.* at 14. Cianbro's motion to reduce Mr. Harding's damages based on his failure to make reasonable efforts to mitigate his damages is denied.

### 2. Reduction of the Back Pay Award Because it Includes Stock Grants Plaintiff Would Not Have Received

Cianbro next argues that Mr. Harding's award should be reduced because it was based on erroneous calculations. Mr. Harding's expert testified that the back pay losses totaled $563,897.00; the jury awarded Mr. Harding $563,000.00 in back pay. Cianbro claims:

> [T]he jury . . . clearly adopted [the expert's] findings. [The expert] testified that he included stock grants in his estimate of Plaintiff's income losses. However, it was undisputed at trial that Cianbro discontinued the management incentive plan at the end of 2004 and that no stock was issued in 2003 or in any year thereafter. The jury therefore had no basis for including 2003, 2004, 2005, and 2006 stock grants in Plaintiff's back pay award.

*Def.'s Mot.* at 15. Mr. Harding, in turn, points back to Cianbro's own argument which states that the expert "did not testify, and his report does not reveal, how he valued future stock grants." *Pl.'s Mot.* at 18 (citing *Def.'s Mot.* at 15). Moreover, Mr. Harding argues that his expert testified that he did not value the stock options as a benefit, but rather included them in income. *Pl.'s Mot.* at 18.

Though seemingly complex, Mr. Wishnick's analysis of stock options is rather straightforward. Cianbro had a management incentive plan that annually granted shares of

Cianbro stock to Mr. Harding and, under this plan, he had received stock grants from the end of 1995 through the end of 2001. Under the plan, an employee's right to the stock did not fully vest immediately; it vested at a rate of 10% per year. *Tr.* at 400:21-24. As of his termination, Mr. Harding owned 15,764 shares of Cianbro stock under this plan. Applying the annual vesting percentage to his shares, he had a vested interest in 9,153 shares and was not vested in 6,611. On the assumption that he would have increased his vested interest in these shares at an annual rate of 10% if he had continued working at Cianbro and ultimately would have been fully vested, Mr. Wishnick calculated the loss from his termination at the number of non-vested shares times the price per share as of August 1, 2006 of $14.25, a figure stipulated by the parties. *Tr.* at 351:1-19. Based on these assumptions, the resulting stock loss was $94,202. *Tr.* at 401:25.

Cianbro objects to this figure because the jury "had no basis for including 2003, 2004, 2005, and 2006 stock grants in Plaintiff's back pay award." *Def.'s Mot.* at 15. Cianbro's argument, however, badly misconstrues Mr. Wishnick's testimony. *Tr.* at 354:5-16.[20] The plain fact is that Mr. Wishnick did not include any stock grants for those years in his calculations. He did assume that Mr. Harding would continue to vest at 10% per year in the unvested stock and would ultimately fully vest. However, contrary to Cianbro's argument, the $94,202 figure did not include any assumptions about Mr. Harding receiving any additional stock after 2001.

It may be that Cianbro's point is that there is no evidence that the non-vested portion of Mr. Harding's stock ever vested, since Cianbro discontinued that stock grant plan at the

---

[20] Mr. Wicknick testified about the number of non-vested shares Mr. Harding had through 2001. In explaining his testimony, he used a demonstrative exhibit, which was not admitted into evidence. *Tr.* at 350:19-23. Mr. Wishnick's report, however, was admitted for purposes of the front pay issue. The figures in that report correspond with the figures in his testimony and unequivocally confirm that he did not include any stock grants after 2001. *Pl.'s Ex.* # 31 at 5.

end of 2004. However, when Ms. Bubar testified about Cianbro's termination of the stock grant plan and its purchase of the employees' stock in 2004, she stated: "That particular plan terminated at the end of 2004, and *all of the stock* was bought back by the company." *Tr.* at 644:4-5 (emphasis added). There was no further evidence on this point and this cryptic statement could reasonably be interpreted as affirming that when Cianbro dissolved the plan in 2004, it repurchased both vested and non-vested stock.[21] Based on Ms. Bubar's testimony, Mr. Wishnick's calculations on the value of the loss of Mr. Harding's non-vested stock were entirely correct.

The Court cannot conclude that the jury's award "exceeds any rational appraisal . . . of the damages that could be based upon the evidence." *Wortley v. Camplin*, 333 F.3d 284, 297 (1st Cir. 2003).

### 3.   Reduction of the Back Pay Award for Certain Benefits

#### a.   Health and Welfare Benefits

Cianbro argues that Mr. Harding is not entitled to recover the value of health and welfare benefits because there was no evidence that he incurred any out-of-pocket expenses, as required by the First Circuit. *Def.'s Mot*. at 16. It is true that in the First Circuit lost benefits are "recoverable only if the plaintiff has offered evidence of out-of-pocket expenses for the same benefits." *McMillan v. Mass. Soc'y for Prevention of Cruelty to Animals*, 140 F.3d 288, 305 (1st Cir. 1998). Mr. Harding responds that Cianbro waived any objection to including health and welfare benefits by failing "to object at trial to the issue of insurance benefits being tried to the jury, failed to request a jury instruction on same, did not object to

---

[21] This conclusion is buttressed by the fact that Cianbro is an employee-owned company. *Tr.* at 1090:23-25 ("We're a hundred-percent, employee-owned company."). Presumably, it would not be in the interest of the employee owners to allow management to adopt a stock buy-out plan that extinguished the value of their non-vested stock.

[the expert's] inclusion of the cost of said benefits and failed to petition the Court to disallow the insurance benefits issue." *Pl.'s Mot.* at 20.  The Court agrees and will not now address the issue of health and welfare benefits.  *Figueroa-Torres v. Toledo-Davila*, 232 F.3d 270, 272 (1st Cir. 2000) ("[A] party may not sit by without objection to rulings or instructions, and then after verdict and judgment, and when it is too late for the court to change its rulings or charge, come forward with objections . . . and seek to put the court in error.") (internal punctuation and citation omitted).

### b.  Payment of Additional Taxes Incurred on Stocks

Cianbro objects to another of Mr. Wishnick's calculations.  Mr. Wishnick used a 1999 total compensation statement for Mr. Harding to calculate his benefits.  *See Pl.'s Ex.* 27.  He took the value of discretionary benefits – health and welfare and profit sharing – which totaled $7,333.48 and the value of the taxes Cianbro paid Mr. Harding on the full value of his stock purchase, which totaled $4,118.93, and added them for a total of $11,452.00.  *Pl.'s Ex.* 27; *Ct. Ex.* P-31.  He assumed the benefits would grow at a rate of 3% per year and added interest on past due benefits from 2002 to August 1, 2006 to arrive at a total past benefit loss of $53,533. *Tr.* at 346:11-25, 347-348:1-7.[22]

Cianbro notes that because this figure assumes that Mr. Harding would continue to receive stock grants and hence tax value payments into the future, it is erroneous, since Cianbro did not issue stock grants in 2003 and ceased its stock grant program in late 2004. Carving out the tax value payments from the other benefits, Cianbro states that "had Wishni[c]k isolated Cianbro's 'tax contribution' from the other benefits that he analyzed, he would have valued Harding's benefit loss attributable to the tax gross-up payments between

---

[22] These figures are also reflected in Mr. Wishnick's report entered before the Court as Plaintiff's Exhibit Number 31 for purposes of front pay calculations only.  This report did not, therefore, go to the jury, but it does provide in written form a synopsis of his testimony before the jury.

2003, when the plan ceased, and 2006, at approximately $18,137, including interest." *Def.'s Mot.* at 17.   Cianbro therefore argues that the "back pay award should be reduced by $18,137.00." *Id.*

Here, assuming Cianbro did what it said, Cianbro is factually correct; the Wishnick calculations include an amount that did not continue after 2002.   Nevertheless, the jury's award still stands, because Cianbro waived its current objection.   During trial, presumably for well conceived strategic reasons, Cianbro elected to allow Mr. Wishnick to testify without objection about its tax value payments and later it elected to present countervailing evidence.[23]   This strategic decision allowed Cianbro's counsel to engage in a lengthy and pointed cross-examination of Mr. Wishnick on the faulty evidentiary underpinnings of his calculations, *see Tr.* at 361:16-25, 362:1-25, 363:1-25, 364:1-25, 365:1-3 and during its case, Cianbro presented the testimony of Ms. Bubar about the discontinuance of the management incentive plan. *Tr.* at 644:4-5.   This strategy allowed Cianbro to argue at closing that Mr. Wishnick's calculations were unreliable because "he didn't know that Cianbro's management incentive plan is gone," *Tr.* at 1205:4-5, and to urge the jury to conclude that "the numbers are not reliable.   They're based on something that's wrong.   It's like garbage in; garbage out." *Id.* at 1205:23-25.

Having made this strategic decision, Cianbro must live with it.   The evidence of the existence and benefits of the  management incentive plan and Mr. Wishnick's calculations based on that plan were before the jury.   Although Cianbro asserts that the discontinuance of

---

[23] Cianbro could have contemporaneously objected to this portion of Mr. Wishnick's testimony on the ground that it was without foundation.   If the Court had then allowed his expert testimony subject to an adequate evidentiary foundation, then following Ms. Bubar's testimony, Cianbro could have moved to strike this part of Mr. Wishnick's opinion and requested a curative jury instruction.   It did neither, electing as a matter of trial strategy to vigorously pursue Mr. Wishnick on cross-examination and to make his lack of foundation a central focus of its closing argument.

the plan was "undisputed at trial," *Def.'s Mot.* at 17, the law allows the jury to disbelieve Ms. Bubar about the discontinuance of the plan. It is the jury's sole province to decide who to believe, who not to believe, and how much of a witness's testimony to believe.[24] Moreover, Ms. Bubar's brief testimony about the plan was not unequivocal: "*That particular plan* terminated at the end of 2004, and all of the stock was bought back by the company. So that *that plan* was basically dissolved. And, in 2003, we didn't have a bonus at all. There wasn't (sic) any moneys issued under *that plan*." *Tr.* at 644:4-7 (emphasis added). Based on this testimony, the jury could have concluded that it was not receiving the full story; it was only hearing about that "particular plan," and, therefore, elected to discredit her testimony. If the jury chose to disbelieve Ms. Bubar, the Wishnick amounts are entirely appropriate and the Court cannot conclude that the jury erred as a matter of law.

The Court may not "disturb a jury award of damages unless it exceeds any rational appraisal or estimate of what the damages should be." *McMillan,* 140 F.3d at 305 (citation and internal punctuation omitted). Even regarding economic damages, the jury verdict is entitled to deference. The First Circuit has written that an award of economic damages will not be disturbed "provided it does not violate the conscience of the court or strike such a dissonant chord that justice would be denied were the judgment permitted to stand." *Vera-Lozano v. Int'l Broad.*, 50 F.3d 67, 71 (1st Cir. 1995) (citation and internal punctuation omitted). The court is required to view the evidence in the light most favorable to the plaintiff. *Kelley v. Airborne Freight Corp.*, 140 F.3d 335, 355 (1st Cir. 1998). The jury is "free to select the highest figure for which there is adequate evidentiary support." *Dopp v.*

---

[24] The Court instructed the jury without objection: "In deciding what the facts are, you must consider all the evidence. In doing this, you must decide what testimony to believe and what testimony not to believe. You may believe or disbelieve all or any part of any witness' testimony." *Tr.* at 1149:13-17.

*Pritzker*, 38 F.3d 1239, 1249 (1st Cir. 1994) (quoting *Kolb v. Goldring, Inc.*, 694 F.2d 869, 872 (1st Cir. 1982)).

Cianbro has failed to demonstrate that, if the jury's damage award for back pay included amounts for tax value payments, this constituted legal error, given the extremely high standard the law imposes for disturbing a jury verdict.

### 4. Noneconomic Award

Regarding noneconomic damages, the Court instructed the jury that such damages may be awarded for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, and other noneconomic losses if the jury found that Mr. Harding had proved by a preponderance of the evidence that he experienced any of these as a result of disability discrimination. *Tr.* at 1156:15-20. The jury returned an award of $137,000 in noneconomic damages.

The First Circuit has commented that "[t]ranslating legal damages into money damages – especially in cases which involve few significant items of measurable economic loss – is a matter peculiarly within a jury's ken." *Nydam v. Lennerton*, 948 F.2d 808, 811 (1st Cir. 1991). As such it "rarely will override the jury's judgment on the appropriate amount of damages to be awarded. The jury's otherwise supportable verdict stands unless [it is] grossly excessive or shocking to the conscience." *Brown v. Freedman Baking Co.*, 810 F.2d 6, 11 (1st Cir. 1987). The First Circuit distinguishes between two types of damage award challenges for impropriety: those that "allegedly fail[] to bear any rational relation to the evidence of the damages presented at trial" and those "where there is some evidence of an improper verdict based on factors other than the amount of the damage award." *Gil-De-Rebollo v. Miami Heat Ass'ns*, 137 F.3d 56, 62 (1st Cir. 1998). If the allegation of

impropriety is based solely on the amount of the damage award, the "circumstances under which a trial court may overturn a verdict are more limited." *Id.*  By contrast, if the allegation is based on matters outside the amount of the award itself, such as inconsistent jury responses to special interrogatories, the trial court's discretion is "broader." *Id.*  Here, Cianbro's challenge is based solely upon the amount of the award and the Court's discretion is, therefore, more constrained.

Cianbro argues that the noneconomic damage award is disproportionate to the injury, and suggests that there was relatively little evidence relevant to the emotional distress of either Mr. Harding or his wife.  *Def.'s Mot.* at 18.  Mr. Harding cites his trial testimony to establish how his life changed after being terminated:

> Quite a change of life. I don't know if there's a simple, easy way – I don't know. Easy way to explain it might be it's like my wife and I just dropped about 35 years and went back to where we started, you know, small income, struggling, worrying how you're going to pay the bills. I would say the bigger difference between then and now is then we didn't have anything, so we didn't have anything to lose. Now we just kind of worry and struggle how to keep everything that we worked so hard to get, you know, things like – you know, we'd gotten into the mode of making a little bit of money, go out to supper once or twice a month, fill the gas tank, just go for a ride for something different, go visit friends. Now, well, we pretty much have to budget how much gas we can spend and how much traveling around we do. We do – we don't go out to lunch, supper, whatever. We pretty much just stay home, like we did when we was starting and trying to make every dollar into two dollars, if you can.

*Pl.'s Opp'n* at 21.  Mr. Harding went on to recount that he was "devastated" and "just couldn't imagine what – what was going on, what had happened."  *Id.* at 20.  He further "described how he had had to borrow $10,000 from his retirement account to stay afloat financially." *Id.* at 21.

Mindful of the deference to the jury's assessment of Mr. Harding's damages, the Court declines to override its non-economic damage award.  Nor, in light of the evidence, can the Court conclude that $137,000 is grossly excessive or shocking to the conscience. The Court will not reduce Mr. Harding's noneconomic damage award.

### 5.  Punitive Damage Award

Finally, Cianbro argues that the punitive damages award is unsupported by the evidence.  Claiming that an employer may only be held liable for punitive damages if it is found to have acted with "reckless indifference to [the plaintiff's] right," Cianbro insists that the only evidence of any "reckless disregard" by Cianbro consisted of the inappropriate and inadmissible rebuttal testimony regarding Mr. Bell's alleged comments that he did not care about a potential discrimination lawsuit.  Contrary to Cianbro's main argument, the Court has concluded that Mr. Bell's comments concerning adherence to antidiscrimination policies was appropriate rebuttal testimony.

Further, without objection from Cianbro, the Court instructed the jury that it could assess punitive damages if Mr. Harding established by a preponderance of the evidence that Cianbro "either knew that its actions violated federal or Maine law or acted with reckless or callous indifference to that risk."  *Tr.* at 1160:15-19, 1165:6-7; *see McDonough v. City of Quincy*, 452 F.3d 8, 23 (1st Cir. 2006) (finding that for punitive damages, a plaintiff must make a showing of "malice or reckless indifference to federally-protected rights"); *Dimarco-Zappa v. Cabanillas*, 238 F.3d 25, 37 (1st Cir. 2001).  During the trial, Cianbro introduced extensive testimony that it was acutely cognizant of the laws against disability discrimination and scrupulously complied with them.  *Tr.* at 636:1-25, 637:1-18, 638:16-25, 639:1-24. Here, Cianbro proclaimed a high degree of knowledge and compliance with these laws, and

once the jury found that Cianbro discriminated against Mr. Harding due to his disability, it is a logical inference that Cianbro must have known that, in doing so, it was violating the law.

Finally, by stipulation, Cianbro narrowed the areas of dispute. It conceded both that Mr. Harding had a disability as defined by Maine and federal law and that he could have performed the essential functions of an electrical superintendent at the time Cianbro terminated his employment. *Tr.* at 115:3-25, 116:1-8. This left for jury consideration two elements: whether Cianbro knew that Mr. Harding had a disability and whether it terminated him because of his disability. Although the jury could have found in favor of Cianbro on these remaining issues, it did not. Taken as a whole, including the stipulations, the verdict was consistent with the jury's determination that all four elements of the claim had been proven: (1) that he had a disability; (2) that he could have performed the essential functions of his job as electrical superintendent; (3) that Cianbro knew he had a disability; and, (4) that Cianbro fired him because of his disability. Having concluded that Mr. Harding had demonstrated each of these elements, it was a short step to the imposition of punitive damages, since the evidence virtually compelled the conclusion that a corporation as large, as well-run, and as sophisticated as Cianbro had to know that in terminating Mr. Harding under these circumstances, it was violating the law. As such, the evidence viewed in the light most favorable to Mr. Harding amply justified the imposition of an award of punitive damages.

## III. CONCLUSION

The Court DENIES Defendant's Motion for Judgment as a Matter of Law, Motion to Stay the Judgment, Motion for a New Trial, and Motion for Remittitur (Docket # 188, 189).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 2nd day of May, 2007